### STRANGE et al. v. HICKS et al.

No. 9664—Opinion Filed Jan. 20, 1920.

Rehearing Denied March 30, 1920.

(Syllabus by the Court.)

**1. Contracts — Construction — Intent of Parties.**

The paramount rule for the construction of a contract is to ascertain the intent of the parties at the time the contract was entered into and to give effect to same if it can be done consistent with legal principles. If the language of a contract is such as to clearly show the intent of parties, then there is no need to apply any technical rules of construction, for where there is no doubt, there is no room for construction.

**2. Same—Ambiguity—Parol Evidence.**

If a contract is ambiguous and uncertain, a court may hear oral proof to ascertain the contemporary construction placed thereon. If the acts of the parties show that each has placed the same construction thereon, then in such a case their construction should be given great weight. It is to be assumed that the parties to a contract know best what is meant by its terms and are the least liable to be mistaken as to its intention.

**3. Oil and Gas—Lease—Abandonment—Presumptions.**

Whether or not a lessee of an oil and gas lease has abandoned a lease, depends upon the facts and circumstances of the particular case. An unexplained cessation of operations may give rise to a fair presumption of abandonment, and may be that standing alone a court as a matter of law may declare the lease abandoned.

**4. Same — Lease—Implied Contract — Diligence in Producing.**

If an oil and gas lease does not expressly provide for the operation of the lease after the discovery of either oil or gas or both, then there is an implied contract to exercise diligence, under the facts and circumstances of the case, to operate the same. thus making the lease remunerative to the parties to it.

**5. Same—Lack of Diligence in Operation—Forfeiture of Lease.**

Neither party to the contract is the arbiter as to whether or not due diligence has been exercised to operate an oil and gas lease. If an oil and gas lease is not operated with due diligence under the facts and circumstances of the case, then a court, upon proper showing, may declare the lease forfeited.

**6. Same.**

Forfeiture of an oil and gas lease after development and discovery of oil for failure to operate is a harsh and severe remedy, and should only be declared where the same is more consonant with the principles of right and justice than to withhold such equitable relief.

**7. Same—Judgment—Sufficiency of Evidence.**

We have examined the record in this case, and find that the judgment of the trial court holding that the lease had not terminated, that the lessees had not abandoned it, and that they had not forfeited the same for failure to operate the lease, is not against the clear weight of the evidence.

Error from District Court, Rogers County; W. J. Campbell, Judge.

Action by C. J. Strange and others against H. L. Hicks and another to cancel an oil and gas lease and for a restraining order. Judgment for defendants, and plaintiffs bring error. Affirmed.

C. B. Holtzendorff, P. W. Holtzendorff, and Edgar A. DeMeules, for plaintiffs in error.

Wilson, Tomerlin & Buckholts, for defendants in error.

HIGGINS, J. The plaintiffs in error will be referred to as plaintiffs, and defendants in error as defendants, they so appearing in the court below.

This is a suit instituted to cancel an oil and gas lease and to restrain the lessees from entering upon the lands involved. The decree of the lower court was in favor of the defendants, and the plaintiffs seek a review of the same in this court.

From an examination of the entire record before us, we find the facts as follows: In 1913 H. L. Hicks and Dr. A. C. Enochs leased quite an area of land in Rogers county, Oklahoma, for oil and gas purposes. This was undeveloped at this time and some distance from production of either oil and gas. It was what was commonly known as "wild cat" territory. On December 4, 1913, the lease in question was executed by C. J. Strange and wife to H. L. Hicks, who assigned an undivided interest therein to his associate in the enterprise, Dr. Enochs.

The lease is the customary oil and gas lease, and it provides that it shall remain in force for a term of two years, or as long thereafter as oil or gas or either of them is produced from said land by the lessee or his assigns. It provides that the lessee shall pay the lessor the sum of $50 per year during the time which such gas shall be used. It is agreed therein to complete a well in one year or to pay at the rate of $1 per acre for each additional year completion is delayed, and that a completion of such well shall operate as a full liquidation of all rent under this provision during the remainder of the term of this lease; that the lessee shall have the right at any time to remove machinery, fixtures, and to draw and remove the casing from the premises.

The defendants commenced at once to develop the lease in accordance with the terms of the contract, and by March 1st of the following year had completed a well, finding gas of about 700,000 cubic feet production. Upon the completion of the well the defendants capped the same and moved the machinery to other lands nearby which were in their block of leases, of which plaintiffs' lands were a part. The defendants continued to develop the field, and up till 1917, at the time of this suit, had put down some 30 wells, ten or twelve being dry, the others producing gas ranging from half a million to six million cubic feet. The total outlay cost the defendants from $60,000 to $75,000. One of the defendants, H. L. Hicks, lived upon the leases and personally looked after the same by going to the wells, which included the well in question, and blowing them off at certain periods and taking the pressure. In order to sell the gas it was necessary to get a pipe line in this field. Owing to the fact that the wells were of light production and the United States was engaged in war with Germany, it was with much difficulty that arrangements could be made to get a pipe line into this territory. The lessees for a period of three years after the execution of the lease continued to develop this territory, drilling some 30 wells,

with the hope that sufficient gas would be discovered to justify a pipe line being laid to this field. The record shows that Dr. Enochs negotiated with at least ten different pipeline companies or parties interested in same in order to sell the gas from these leases, going with them upon the leases but, owing to conditions then prevailing and the small quantity of gas then discovered, he was unable to secure a line. He, however, continued to develop the territory and to increase the production thereof. The difficulties of securing a pipe line were fully explained to the lessors, and the record indicates that they were friendly to the lessees and realized and appreciated their difficulties in making the lease profitable to both. Finally Dr. Enochs did negotiate for a pipe line to be laid, which was explained to the lessors. A pipe line was finally laid to this field. The lease in question was on a different side of the river from the other leases, and the pipeline company would not agree to cross the river. Dr. Enochs purchased the pipes necessary to connect with the well of the plaintiffs, and dug the ditches to place the line in. All this was known and told to the lessors, who from the record seem to have acquiesced therein. When the time came to connect with the well the other party, J. A. Hull, appeared upon the scene, and into the facts of this suit another chapter is added. He secured from the lessors an oil and gas lease, giving to them more favorable terms than was granted by the lessees who took their lease when it was "wild cat" territory. In the lease he had the lessors sell and assign to him the casing in the well developed by the lessees Hicks and Enochs. This suit was immediately commenced by Strange and his wife, joined therein by the second lessee, J. A. Hull, to cancel and remove the lease of Hicks and Enochs, defendants, as a cloud upon their title, and to restrain defendants from entering upon the lease or taking the gas therefrom or the casing from the wells. As heretofore stated, the court refused to grant plaintiffs any relief, from which judgment an appeal is taken by them to this court.

The plaintiffs give two reasons why judgment should be in their favor: First, that the lease has expired by its terms and limitation; and, second, that the lease has been forfeited by failure to operate and by abandonment.

Under the first assignment of error it is contended that the lease has expired by its own terms and limitations. It is contended that the provision of the lease wherein it was agreed that it "shall remain in force for two years and as long thereafter as oil or gas or

either of them is produced from said land by the party of the second part," has been violated for the reason that during the two years there was no sale of the gas produced. This issue involves the construction of the contract between the parties. The paramount rule for the construction of all contracts is to ascertain the intent of the parties at the time the contract was entered into, and to give effect to same if it can be done consistent with legal principles. Barricklow v. Boice, 50 Okla. 260, 150 Pac. 1094; 9 Cyc. 577; 6 R. C. L., sec. 225. If this proviso, after a consideration of all the other terms of the lease, clearly shows the intention of the parties to the lease, there is no need for applying any technical rules of construction, for where there is no doubt there is no room for construction. 9 Cyc. 578; 9 Cyc. 587; McGoffin v. Coyle, 16 Okla. 648, 85 Pac. 964. If the above proviso of the lease as to its termination is uncertain or ambiguous, it is then the duty of the court to ascertain and give effect to the mutual intentions and understanding of the lessors and lessees; and if such is the case, the court may hear oral evidence to ascertain their intent, in keeping with the rules applicable to the construction of contracts.

The first question for this court to ascertain is whether or not the proviso which it is claimed by the plaintiffs fixes the term of the lease is clothed in language unambiguous and certain as to when the lease did terminate. We are unable to reach the conclusion that the language of the proviso clearly fixes the termination of the lease; that is, that if the gas was not produced from the premises in such a manner as to make the lease remunerative to the lessor within the two-year period, this worked an expiration of the lease. If this had been the clear intent of the parties, the could certainly have expressed this intent in clearer language. We therefore find as a matter of law that the above proviso is ambiguous and uncertain, and that the court was authorized to take oral proof to ascertain the intent of the parties.

When a contract is uncertain or ambiguous, one of the cardinal rules recognized for its construction is to ascertain how parties thereto by their declarations or acts construed it, and for such purpose oral evidence may be received. Weibner v. Peoples. 44 Okla. 32, 142 Pac. 1036; 9 Cyc. 588.

In 6 Ruling Case Law, 852, it is stated:

"It has been said that in order to render applicable the rule that contemporary construction of a contract by acts of the parties is entitled to great weight, it should appear with reasonable certainty that they were acts of both parties, done with knowledge and in view of a purpose at least consistent with that to which they are sought to be applied. In such a case the practical interpretation by the parties themselves is entitled to great, if not controlling influence, in ascertaining their understanding of its terms. In fact, where from the terms of the contract or the language employed, a question of doubtful construction arises, and it appears that the parties themselves have practically interpreted their contract, the courts will generally follow that practical construction. It is to be assumed that parties to a contract know best what was meant by its terms, and are the least liable to be mistaken as to its intention; that each party is alert to protect his own interests and to insist on his rights, and that whatever is done by the parties during the period of the performance of the contract is done under its terms as they understood and intended it should be. Parties are far less liable to have been mistaken as to the meaning of their contract during the period while harmonious and practical construction reflects that intention, than they are when subsequent differences have impelled them to resort to law, and one of them then seeks a construction at variance with the practical construction they have placed upon it of what was intended by its provisions."

In the instant case the record shows that at the trial the parties hereto without objection introduced evidence showing the acts and declarations of the parties, which within itself is evidence that they, too, considered the terms of the contract in reference to its termination doubtful and uncertain, for otherwise this evidence would not have been competent.

A consideration of the acts of the parties to this lease as shown by the record indicates that they, in construing the contract, seemingly did not consider it terminated by the failure of the lessees to market the gas within the two-year period or pay rental thereon. The finding of the trial court is at least not against the clear weight of the testimony on that issue.

In the second assignment of error the plaintiffs contend that the lease has been forfeited by failure to operate and by abandonment.

Whether or not a lessee abandons a lease depends upon the facts and circumstances of the particular case. An unexplained cessation of operations may give rise to a fair presumption of abandonment, and it may be that standing alone a court may as a matter of law declare the lease abandoned. The unexplained cessation of operations may, however, be satisfactorily explained. In this case one of the lessees gave his personal attention to this and other leases, and at cer-

tain periods would go to the well on this lease and blow it off. In conversation the lessees explained to the lessors that their inability to market the gas was caused by their inability to secure a pipe line. They admitted that they capped the well and moved their machinery from the lease, but explained that this was done for the purpose of developing other leases in the same block of leases and thus finding sufficient gas to justify the laying of a pipe line to this field.

The court found from the evidence that the lessees had not intended to abandon their lease, and we do not believe such finding is against the clear weight of the evidence.

The next contention under this assignment is that the lease has been forfeited by the failure of the lessees to operate the same. That is, it is claimed by the plaintiffs that a failure to market the gas for a period of about three years is sufficient within itself to work a forfeiture of the lease for failure to operate same. There is an implied agreement by the lessor and lessee, in case oil or gas should be produced in paying quantities, to exercise diligence to market the same; and in case diligence is not exercised to operate the lease, a court may declare the lease forfeited. Neither party to this suit is the arbiter as to whether due diligence has been exercised to operate the lease. Indiana Oil, Gas & Development Co. v. McCrary, 42 Okla. 136, 140 Pac. 610.

Whether or not due diligence has been exercised depends on the facts and circumstances of the case. The question in this case is whether or not the lessees, under the facts and circumstances of the case, exercised proper diligence to operate the lease, having regard to the interests of both parties. In this case the evidence shows that under the terms of the lease the lessees had one year to complete a well. This was done, however, in three months, and a small quantity of gas found. If the same was to be remunerative to both parties, other wells must be developed to produce sufficient quantities to justify the building of a pipe line. The lessees continued to develop other leases in this block of leases. Negotiations were had with various parties to build a pipe line to this field. This was unsuccessful, owing to the small quantity of gas discovered. The lessees, in order to meet this difficulty, continued, and while the United States was engaged in war with Germany, to develop this block of leases till 30 wells had been put down, at a cost to the lessees of $60,000 to $75,000, which covered the period of about three years. A pipe line was then secured, and when the ditches were dug and the gas pipe secured and hauled to the lease and connections with the wells was about to be had, the plaintiffs G. C. Strange and wife then entered into a lease with the other plaintiff, J. A. Hull, who had never spent any sum whatever in the development of the field, and as a result this suit was commenced. The trial court found that the lessees, under the facts and circumstances of this case, exercised due diligence to market the gas, and in this finding of the trial court we find no error. We believe that, under the facts and circumstances of this case as shown by the record, the lessees with commendable zeal exercised the utmost good faith to carry out the terms of their contract, looking to the interests of all parties.

Forfeitures are usually harsh and oppressive, and a court of equity will generally refuse to aid in their enforcement. The party seeking the forfeiture must himself be without fault, and must come into court with clean hands. A forfeiture, however, will be declared when the same is more consonant with the principles of right and justice and morality than to withhold equitable relief. A lessor must act diligently after the discovery of his right to a forfeiture on account of a breach of the contract to operate the lease with due diligence. Indiana Oil, Gas & Development Co. et al v. McCrary, supra.

In this case the record shows that the lessees had made known to the lessors the difficulty of securing a pipe line, and that owing to such condition, a further development of the field at great expense was being had to increase its production. In this the lessors acquiesced, or at least made no claim that the lease was forfeited. They were also told that a pipe line was secured, and knew the ditches were being dug to their well and that gas pipe was being hauled, and they still acquiesced and made no claim the lease was forfeited. The record shows that in two or three days the well would have been connected with the pipe line, the well became more valuable, and Hull then made them a more favorable offer and they executed to him a second lease and a sale of the casing which the lessees, Hicks and Enochs, had placed in the well. We do not believe that the plaintiffs come into court with clean hands. By acquiescing in the acts of the lessees in the development of this field and making no claim that the lease was forfeited but by every act of theirs indicating the lease was in full force and effect, they obtained an advantage which they sought to capitalize at the expense of the lessees. When they were told by the lessees that a greater volume of gas must be discovered in order to make this well remunerative to all, and when they saw at a great expense to lessees they were further developing the field, and, further-

more, when they were told and knew a ditch was being dug and gas pipe laid to their well, good conscience required them to then speak and claim their right of forfeiture. "He that is silent when conscience requires him to speak should not be permitted to speak when conscience requires him to be silent."

We find, under the facts and circumstances of the case, that the right of forfeiture should be denied plaintiffs.

Judgment affirmed.

OWEN, C. J., and KANE, RAINEY, PITCHFORD, JOHNSON, and BAILEY, JJ., concur. McNEILL, J., dissents.