## WESTERN STATES OIL & LAND CO. et al. v. HELMS et al.

No. 17750.  Opinion Filed Feb. 4, 1930.

Rehearing Denied June 10, 1930.

Sam P. Ridings, Joe B. Allen, Reuben M. Roddie, J. B. Drennan, and Simons, Mc-Knight, Simons & Smith, for plaintiffs in error.

Nowlin, Spielman & Thomas, for defendants in error.

ANDREWS, J. This action was commenced in the district court of Oklahoma county by the defendants in error (hereinafter referred to as plaintiffs) on February 7, 1924, for the recovery of a judgment against the plaintiffs in error, the Western States Oil & Land Company (hereinafter referred to as the oil company) and Len S. Swaggert and Pauline Swaggert (hereinafter referred to as the landowners).

On the trial of the action judgment was rendered in favor of the plaintiffs against the oil company and the landowners, and each of them, from which an appeal was taken by them to this court.

An examination of the record shows the following facts:

The landowners owned a tract of land in Grant county, Okla. On October 26, 1920, the oil company obtained an oil and gas mining lease on the land and entered into possession thereof under that lease. A well was drilled to the approximate depth of 3,000 feet and was completed in May, 1921, producing at the outset approximately 450 barrels of oil a day and decreasing in amount until January, 1922. The oil company and the landowners contend that at that time "* * * it produced approximately twelve and one half barrels of oil," and plaintiffs contend that

"The oil company continued to produce oil from the well until some time in January, 1922, when its production ceased, and, according to the statement of the superintendent of the oil company, the sand was 'bone dry'."

There was no other development of the property at that time and no effort had been made to further develop the property. The lease was for a term of one year and contained the following provision, to wit:

"It is agreed that this lease shall remain in force for a term of one year from this date and as long thereafter as oil or gas, or either of them, is produced from said land by the lessee."

In January, 1922, the landowners employed the plaintiffs as attorneys, who advised them that the term of the lease had expired unless oil or gas was being produced from the land, and if the well was then dry and no oil or gas was being produced therefrom, the landowners had a legal right to declare the lease at an end. Thereupon plaintiffs prepared and on or about the 10th day of February, 1922, had a notice served upon the oil company by the sheriff of Grant county, notifying the oil company that it had failed to comply with the terms and conditions of the lease, that it had not developed the premises in a reasonable manner, that it was not producing oil or gas from the premises and that the lease had terminated, and commanding and instructing the oil company to remain off the premises and forbidding it to trespass upon the premises in any manner. On the 30th day of January, 1922, the oil company went into the well, pulled the tubing and started rigging up to deepen it. The notice of the landowners to the oil company was ignored. The landowners then entered into a written contract with plaintiffs on a contingent basis and authorized them to institute suit for the protection of their rights. On April 25, 1923, suit was filed for the landowners against the oil company by plaintiffs in the district court of Grant county for the purpose of having the lease declared terminated. Indorsed on the petition was an attorney's lien claim with the signature of the plaintiffs, and thereafter plaintiffs had a written notice of their attorney's lien served upon the attorneys for the oil company, to which notice was attached a copy of their contract. On motion of the oil company the cause was removed to the United States District Court for the Western District of Oklahoma. At the time the suit was filed the oil company was drilling at a depth of approximately 3,350 feet, and it continued drilling to a depth of 4,000 feet, where a gas sand was encountered and the same was turned into a gas well on or about March 23, 1923. The oil company filed its answer in the form of a general denial and admitted the execution of the lease, and on the 28th day of April, 1923, it filed another answer, in which it alleged that the well was then producing gas in commercial quantities which was being marketed in accordance with the lease and

"This defendant avers that plaintiffs herein rescinded the protest referred to in paragraph 5 of the first cause of action of plaintiffs' bill and allowed and requested this defendant to continue the operation and production from said oil and gas well."

Upon the filing of the amended answer the plaintiffs, on May 4, 1923, wrote the landowners calling their attention to the filing of the amended answer, and that if the allegations thereof were true the same might constitute a complete defense to the suit, and asked the landowners to advise them by return mail the facts in connection therewith. On about the 9th or 10th day of May, the plaintiffs received a letter from the landowners in which they said: "We are writing Judge Cotteral to dismiss the case." On May 7, 1923, a letter was mailed by the landowners to Judge Cotteral at Guthrie asking him to dismiss the suit. The case was set for trial on May 12, 1923, and on that date the plaintiffs were present in court with their witnesses ready for trial and Judge Cotteral announced the request from the landowners that the case be dismissed. Judge Cotteral dismissed the case, and thereupon the plaintiffs instituted this suit against the landowners and the oil company.

The basis of this suit is an alleged settlement between the landowners and the oil company without the consent of the plaintiffs to the damage of the rights of the plaintiffs under their contract with the landowners.

The landowners appeared specially and objected to the service upon them for the reason that it was made in Grant county, and alleged that the oil company was fraudulently joined for the purpose of getting service on the landowners in Oklahoma county.

The oil company entered its appearance for the purpose of removing the cause to the federal court. The petition therefor was denied. The oil company saved its exception on the ground of misjoinder of parties defendant, and the exception was overruled.

The first proposition presented is that the district court of Oklahoma county was without jurisdiction, and it is contended that:

"The basis of this action being to recover against this defendant for having settled a lawsuit involving an oil and gas lease on a tract of land situated in Grant county, Okla., no part of which was within the confines of Oklahoma county, Okla., the district court

of Oklahoma county was without jurisdiction to hear, try and determine this cause, and the demurrer of this defendant to plaintiffs' petition on that ground should have been sustained."

And in support thereof there is cited Nelson v. Deming Investment Co., 21 Okla. 610, 96 Pac. 742, which was an action to quiet the title by removing a cloud caused by the recording in the office of the register of deeds of a certain instrument affecting the title of the real estate, and Nicoll v. Midland Savings Co., 21 Okla. 591, 96 Pac. 744, which was an action to quiet title to real estate. Neither of those cases is in point.

After the plaintiffs had been regularly employed as attorneys and after they had performed services in accordance with the terms of their contract, the landowners owed them a fee. If, after the oil company had notice of the attorneys' lien and contract, it deliberately brought about a settlement with the landowners without giving the plaintiffs notice or an opportunity to protect their interests, the oil company became liable. Neither the title to the real estate nor any interest therein is involved in the action.

The oil company was personally served as provided by the statutes, and the court thereby acquired jurisdiction over it.

The landowners contend that the court had no jurisdiction over them for the reason that the oil company was wrongfully joined as a defendant, but there is no evidence to support that contention.

In our opinion the district court of Oklahoma county had jurisdiction of the subject of the action and acquired jurisdiction over both the oil company and the landowners.

The second proposition presented is that the plaintiffs failed to show facts sufficient to constitute a cause of action against the oil company.

One of the issues involved in this proposition is whether or not the lease had terminated by reason of its terms and the failure of the oil company to produce oil therefrom. The oil company contends that while the well was producing oil they elected to deepen the well and that the well produced up to the time the oil company began the deepening process.

It is contended that the oil sand was not dry and that

"Once oil or gas is discovered and produced from premises within the initial period of the lease, it constitutes a condition precedent to extend the lessee's right to continue operations beyond the initial period—in this case one year. Such discovery gives to the lessee a limited vested interest in the premises, and his right to continue operations or development of the lease will not be lost if the lessee continues to drill deeper in search of oil or gas in lower sand, and should he discover oil or gas in paying quantities in the lower sand, he will not forfeit any of his rights or interest in the lease by reason of the fact that production was not continuous from the discovery of oil in the first instance within the initial period and discovery of oil or gas in a lower sand even after the expiration of the initial period."

That issue was submitted to the jury. The jury answered a special interrogatory and fixed the fair value of the seven-eighths of the oil and gas underlying and capable of being produced from the premises at $150,-000. The verdict was a general verdict in favor of plaintiffs and against the landowners and the oil company for $50,000.

An action by an attorney to recover an attorney's fee from his client joined with an action to recover an attorney's fee from an adverse party under the provisions of section 4102, C. O. S. 1921, is a law action and triable to a jury notwithstanding the quotation in Simpson v. Baker, 123 Okla. 118, 252 Pac. 834, from Boland v. Reily, 115 Okla. 107, 241 Pac. 742, to the contrary. There is no such statement in the Boland decision, and that case does not hold to that effect. The parties hereto recognized this rule and the cause was submitted to a jury without objection.

The rule followed in this state that the verdict of a jury will not be disturbed upon appeal if there is any competent evidence to support the same, is stated in Moses v. Harris et al., 111 Okla. 54, 237 Pac. 591, as follows:

"On a challenge to the sufficiency of the evidence to support the verdict, the question presented on appeal is, admitting the truth of all the evidence of the plaintiff, together with such inferences and conclusions as may reasonably be drawn therefrom, eliminating all evidence of defendant in conflict with plaintiff's evidence, and all opposing inferences, whether there is any competent evidence tending to support the verdict against defendant."

And this court will examine the record in support of this issue only so far as is necessary to determine whether or not there was any competent evidence to support the verdict.

The opening statement for the oil company recites the following:

"The evidence will show to you that when that well went down, when it quit running, they put it on the pump and they pumped it as long as they could get a barrel and a half of oil a day out of it, and they had to keep a man there day and night to look after that pumping, and they pumped thousands and millions of gallons of water in order to get a few barrels of oil, and they were losing money all of the time, and it went down to about a barrel a day, and they had to discontinue the pumping of it, and it had actually gone dry; it had gone dry"

—and the following:

"Now, the evidence will show to you, gentlemen, that when that well went dry, when it refused to pump any more oil, when we put it on the pump and pumped and pumped until we pumped nothing but water coming out of the very sand where the oil had been in, that this lessee at that time owed the Western States Oil and Land Company money. * * *"

One of the plaintiffs talked with the superintendent of the oil company about the condition of the well at the time the notice to quit was served, and he said that the sand was bone dry. One of the employees in the office of the Corporation Commission produced correspondence between the oil company and the Corporation Commission in which the Corporation Commission asked for a "shot report" and as to whether or not the oil company considered the oil sand barren when the well was abandoned as an oil well. In answer to that inquiry the oil company replied:

"We considered this oil sand barren when we abandoned it as a oil sand."

E. V. Croxton, a drilling contractor and dealer in leases, testified as to the value of the property. In cross-examination the attorneys for the oil company and the landowners sought to reduce the valuation given, and examined this witness as follows:

"Q. You know that that oil well played out? A. Yes sir. Q. And the sand became dry? A. Yes, sir."

—and:

"Q. And don't you know that well always produced more water than oil? A. No, sir; it did not. Q. It did toward the last, didn't it? A. Yes, toward the last. Q. And finally quit producing oil altogether? A. Yes, it absolutely quit. Q. And when it quit producing oil and until it was deepened it had no substantial value, did it? A. That well would have no value whatever in that sand."

—and:

"Q. Now, when that oil well quit flowing on the Swaggert place, that condemned it for oil in that sand, didn't it, in that location? A. In that location; yes, sir, absolutely."

James S. Martin, an oil man, testified as to the value, and on cross-examination he was asked and answered:

"Q. Are you taking into consideration the fact that a well had been drilled on this Swaggert 80 acres lease down to something over 2,900 feet into a sand about three feet thick that had water under it in which the oil had played out and the sand had become barren? A. Yes, sir."

—and:

"Q. Now, are you considering the fact that an oil well had been put down, oil struck and then the sand became barren with no production and with water in the well? A. Yes, sir."

A. C. Fletcher, who was at that time the field superintendent for the Western States Oil & Land Company, and who wrote the letter to the Corporation Commission, attempted to explain the statements therein contained, but on cross-examination testified:

"Q. You told them it was barren. A. All right; let her ride. Q. Did you tell the truth? A. No, I didn't tell the truth about it. Q. Why didn't you tell them the truth? A. Because I didn't think it was necessary. Q. Oh, because you didn't think it was necessary. A. You have not dealt with the Corporation Commission very much. That was a very minor point."

An examination of this record discloses that up until the plaintiffs' testimony was completed the landowners and the oil company sought to show that this oil saw was dry at the time they left it and commenced drilling deeper. The opening statement shows to that effect and the cross-examination clearly shows it. The evident purpose at that time was to show that the property had no value. They cannot now be heard to say that they did not mean what they said in the presence and hearing of the jury, and it certainly cannot be said that there was not competent evidence to support the verdict of the jury in this respect.

This court in Anthis v. Sullivan Oil & Gas Co. et al., 83 Okla. 86, 203 Pac. 187, had under consideration an oil and gas mining lease containing the same term provision as the lease in issue here. It was therein alleged that the property was no longer producing oil or gas and that the only well on the premises had been plugged and abandoned. Defendants therein contended that the well had not been plugged and that they were further developing the premises and

were drilling a well. This court in construing the term provision of the lease said:

"There might be some question arise as to whether the lessee was producing oil or gas within the meaning of the terms of the lease, but there can be no controversy on this question when there is no well on the premises from which oil or gas can be produced. The law presumes that parties understood the import of their contract, and they intended that which its terms manifest, as stated in 6 R. C. L. 835, as follows: 'The law presumes that the parties understood the import of their contract, and that they had the intention which its terms manifest. It is not within the function of the judiciary to look outside of the instrument to get at the intention of the parties, and then carry out that intention regardless of whether the instrument contains language sufficient to express it; but their sole duty is to find out what is meant by the language of the instrument.'

"Again, in the same paragraph, the following language is used: 'The object to be attained in construing a contract is to ascertain the meaning and intent of the parties as expressed in the language used.'

"The above law has been followed and announced by this court in many cases, among which are Bearman v. Dux Oil & Gas Co., 64 Okla. 147, 166 Pac. 199; Wolf v. Blackwell Oil & Gas Co., 77 Okla. 81, 186 Pac. 484; Withington v. Gypsy Oil Co., 68 Okla. 138, 172 Pac. 634."

—and:

"An oil and gas lease is a contract which the parties have a right to enter into, and there is no reason, when the terms are plain and unambiguous, that they should not be enforced.

"It is a well-known rule of law: 'The law will not make a better contract for parties than they themselves have seen fit to enter into, or alter it for the benefit of one party and to the detriment of the others; the judicial function of a court of law is to enforce a contract as it is written.' Kupfersmith v. Delaware Ins. Co. (N. J.) 86 Atl. 399.

"The defendants in error rely upon the case of Strange v. Hicks, 78 Okla. 1, 188 Pac. 347, but this case can be easily distinguished from the facts in that case. In that case a well had been drilled upon the premises and gas found in paying quantities, and while the gas was not being produced, it was because the parties were unable to connect with pipe line. While the writer of this opinion dissented in that case, still the cases are easily distinguished, because in that case a well was upon the premises from which gas could be produced, but in the instant case it is admitted there is no well upon the premises from which oil or gas can be produced. The case of Prowant v. Sealey, 77 Okla. 244, 187 Pac. 235, is also cited and relied upon, but in that case the lease was for three years and as much longer as oil or gas was found thereon, or said premises developed or operated. The question before the court was whether the words 'developed or operated' gave the lessee the right to develop the premises after the three-year period, but the lease in the instant case contained no such provision.

"It is further contended that a court of equity will not forfeit the lease under the facts existing in the case at bar. This court, in the case of Curtis v. Harris, 76 Okla. 226, 184 Pac. 574, stated in substance: It is not a question of forfeiture, but whether the lease terminated by its own terms. If the lease terminates by its own terms, there is nothing to forfeit."

The authorities cited in support of that proposition are to the effect that the evidence necessary to show that the lease remained in force and effect must be sufficient to show that the deeper drilling was with the intention to return and utilize the oil or gas from the producing sand if discovery was not made at a greater depth. Under the evidence in this case, as construed by the jury, the producing sand has become dry and the rule applicable hereto is materially different. Here, there was nothing cased off and nothing was saved. Whether or not there was anything below was purely a matter of speculation, and we know of no reason why the exhaustion of the oil or gas discovered during the initial period, under this form of lease, should be construed to give the lessee an additional initial period in which to look for oil or gas. Our attention is called to no case holding to that effect. Reliance is placed upon the decision of the West Virginia Court in Eastern Oil Co. v. Coulehan et al., 64 S. E. 836, but that case is not and cannot be in point, for there the court said:

"Having discovered gas in the first sand, and almost immediately thereafter in larger quantities in the lower sand, what was to preclude plaintiff from returning to the first sand, and either from the same well, or from a new well drilled, again tapping that reservoir, discovered by it, and producing gas also from it? Of course, if gas had not been found in the lower rock, on the principle announced in the case last cited, production of gas from the first sand, after discovery, could not long be deferred, without incurring the penalty of forfeiture or abandonment."

And that reasoning cannot apply to the facts shown by this record, because here the exhaustion of the oil in the first sand pre-

cluded the lessee from returning thereto and producing therefrom.

The statement of the text-writer quoted from Mills & Willingham, par. 74, as follows:

"Accordingly, it has been held that the discovery of oil or gas in an upper sand, during the term, although neither was actually produced, and operations were continued with the intent of returning and producing from such stratum in case no further production was discovered at a lower level, vested in the lessee the right to produce from the sand discovered after the expiration of the term"

—is undoubtedly correct, but it has no application to the facts shown by the record in this case. We hold that under an oil and gas mining lease for a specific term "and as long thereafter as oil or gas, or either of them, is produced from said land by the lessee," the lessee, after having discovered oil or gas during the initial term of the lease, may continue to produce oil or gas therefrom until the exhaustion of the oil or gas discovered during the initial term, or the lessee may, after the expiration of the initial term, temporarily abandon the oil or gas discovered during the initial term for the purpose of further exploration at a greater depth and with the intent to return and produce the oil or gas discovered during the initial term if other oil or gas is not discovered at a greater depth, but such a lessee may not continue exploration after the expiration of the initial term and the exhaustion of the oil and gas discovered during the initial term.

The trial court requested the jury to determine whether or not the landowners had a good cause of action, and the jury determined that question in favor of the plaintiffs. We cannot say that there was no competent evidence to sustain that verdict.

In view of our determination that under the facts, as determined by the jury under the instructions of the court, the landowners could have recovered from the oil company, it is not necessary for this court to, and it will not, consider the case of Simpson v. Baker, supra, or the rule therein announced further than we have heretofore discussed it.

The cases cited on the question of abandonment of the lease are not in point, for the reason that there was no question of abandonment. The question here was whether or not the lease had expired. If the lease had expired, then the oil company had lost its rights, and it was immaterial whether it intended to abandon or had abandoned the lease.

An examination of the authorities cited discloses that none of them support the contention of the oil company and the landowners. They involve construction of leases containing provisions different from that contained in the lease herein involved, or they show that the development after the expiration of the initial term was exploratory and with intent to return and produce the oil or gas discovered during the initial period. None of them involve the provision contained in the lease involved in this action and a state of facts where the oil and gas discovered during the initial period has been exhausted.

The second issue involved in this second proposition presented is that:

"The plaintiffs produced no evidence that could tend to prove that the Western States Oil & Land Company compromised the suit in the federal court, or promised, paid or gave any consideration to have said suit dismissed, or did anything to induce the Swaggerts to dismiss said suit."

Much is said in the briefs as to the plaintiffs having had notice of the dismissal of the suit by the landowners. We think that it is immaterial whether or not plaintiffs had notice of the dismissal thereof. No dismissal of the suit was necessary, as the trial court, after the change in the conditions and upon proof thereof, would have dismissed the suit or would have rendered judgment in favor of the oil company. The question to be determined is, Did the plaintiffs have notice of the settlement of the cause of action between the oil company and the landowners? The evidence shows that the plaintiffs first learned of the changes in the conditions when the amended answer of the oil company was filed in the United States court. Those changes were set forth in that amended answer. The settlement of the cause of action, if any, was before the filing of that answer. The settlement, if any, was without the knowledge of, or notice to the plaintiffs.

The means or methods used to settle the cause of action of the landowners, in which the plaintiffs had a valuable interest, was immaterial. The question is, Was an arrangement perfected between the landowners and the oil company which destroyed the rights of the landowners to recover in their suit against the oil company and which precluded the plaintiffs from recovering their contingent interest in the litigation?

The amended answer of the oil company,

in the United States court contained allegations as follows:

"* * * This defendant avers that the plaintiffs herein rescinded the protest referred to in paragraph 5 of the first cause of action of plaintiffs' bill and allowed and requested this defendant to continue the operation of and production from said oil and gas well."

Under the facts as shown by the evidence, the lease made between the landowners and the oil company had expired and the oil company had no rights in the premises. If the oil company thereafter acquired any rights in the premises, it must have been by reason of the action of the landowners. The oil company in its brief says:

"All of the evidence shows that the Western States Oil & Land Company did nothing but what it had a right to do under its lease, that is to say, produce and develop it and pay the royalty in accordance with the terms and conditions thereof. This being the case, there was no abandonment, nor was there any settlement of any suit between this defendant and the Swaggerts."

We are unable to agree with the statement, as under the evidence the oil company had no lease, and its action in developing the land, producing gas therefrom, and paying royalty to the landowners must have been by virtue of some right that it acquired after the expiration of the lease.

In support of its contention the oil company cites Holley & Means et al. v.Foster, 104 Okla. 196, 230 Pac. 879, Cooper et al. v. Jackson et al., 104 Okla. 277, 231 Pac. 223, and Orwig v. Emerick, 107 Okla. 134, 231 Pac. 234.

In the case Holley & Means et al. v. Foster, supra, the trial court found that the suit there involved had been dismissed "without connivance, agreement, or knowledge of the defendant." Here, the jury, by its verdict, found to the contrary. We agree with the law therein announced that the defendant was not liable to plaintiffs' attorney for an attorney's fee unless the defendant is instrumental in settling the plaintiffs' cause of action without notifying the attorney of such settlement.

In the case of Cooper et al. v. Jackson et al., supra, tihs court said, "* * * there was not a scintilla of direct evidence of such settlement," and affirmed the judgment of the trial court sustaining a demurrer to the evidence. Here the trial court overruled the demurrer to the evidence.

In Orwig v. Emerick, supra, the trial court directed a verdict for the plaintiff therein, and the cause was reversed because of the peremptory instruction given by the court to the jury requiring the jury to find for the plaintiff for one-third of the land and the rents sued for. We hold that in a suit by an attorney against his client and an adverse party to recover an attorney's fee under the provisions of section 4102, supra, the question to be determined is, Did the client and the adverse party, without notice to the attorney, perfect an arrangement that deprived the client' of his rights to prevail against the adverse party in the litigation? The means or methods used to carry out the arrangements is immaterial, and any means or methods producing the result constitutes a settlement or compromise as contemplated by said section.

The amended answer of the oil company in the United States court was sworn to by Mr. O'Leary, the secretary and general counsel for the oil company.

One of the plaintiffs testified that Mr. Ridings, one of the attorneys for the oil company in the United States court, was questioned by Judge Cotteral at the hearing at which the cause was dismissed, and said:

"Mr. Ridings, after the court questioning him two or three times, said, 'Well' he says, 'Yes, Your Honor,' 'They have signed up a division order: they are estopped and have accepted the benefits under the agreement.' That was the substance of it."

A real estate dealer testified that he talked with one of the landowners in February and he was informed that the landowners expected to win the suit against the oil company.

One of the plaintiffs testified that he talked with one of the landowners and she told him that Mr. Simons brought the division order over to their home and they signed it, and that the reason they signed it was that they could get their share of the money due for the gas that had been produced up to that time.

Mr. Simons worked for the oil company, and he testified that he was the field clerk for the oil company. He did not deny the testimony that he had procured a division order to be signed by the landowners.

The superintendent for the oil company told one of the plaintiffs that there was a division order, that Mr. O'Leary, secretary and general counsel, had it.

Mr. Ridings, the attorney for the oil company, examined one of the plaintiffs as follows:

"Q. Well, I was stating that as a matter of law that it was our opinion from the legal propositions that if they had had any

legal claims there it was abandoned from the fact that they had accepted benefits under that lease? A. I think that is about what you said."

One of the landowners testified in the case, but he did not deny that he and his wife had signed the division order and re-instated the lease.

Mr. O'Leary testified that he prepared the amended answer and swore to it, and that he had a copy of the division order, and that division orders were usually sent out by his office to someone in the field if the parties owning the royalty lived near the field, with the request that they get them to sign the division orders.

We quote from the brief of the oil company as follows:

"That, when the gas sand was discovered at approximately 4,000 feet, it produced be-tween four and five million feet of gas per day, which gas was sold by this defendant, and a division order signed by the Swaggerts, from which they received their interest in the one-eighth royalty of the proceeds re-ceived from the sale of the gas; that said lease, at the time this case came on for trial, was producing gas, and the one-eighth royalty was being paid to the royalty own-ers, the Swaggerts receiving their part of the royalty, they having sold a part of the royalty before the execution of the oil and gas lease."

The evidence shows that while this suit was pending in the United States court the oil company procured a new division order from the landowners and paid the landown-ers a portion of the proceeds of the gas sales that had been made, and thereafter con-tinued to pay them a portion of the pro-ceeds of the gas sales.

This court in Garfield Oil Co. et al. v. Crews et al., 134 Okla. 229, 273 Pac. 228, held that the payment by a guardian to his wards after the wards reached majority and the acceptance by the wards of the proceeds of a void guardian's lease, constituted an adoption of the lease by the wards and pre-vented their recovering in a suit to cancel the lease. We do not think it necessary to discuss the authorities supporting that rule.

In the case of Callahan v. Cowley & Rid-die, 117 Okla. 58, 245 Pac. 48, Cowley & Rid-dle, under a contingent fee contract, insti-tuted a suit to cancel an oil and gas lease. At the trial Cowley & Riddle learned that their client and the oil company had com-promised the cause of action. This court said:

"Such settlement validated and confirmed

the lease in said oil company, thus abating such action."

This court in discussing section 4102, C. O. S. 1921, said:

"Any action by the attorney against the client would be based upon, as the instant case is, the contract of employment. Any action against the adverse party would be based upon said section 4102, by which also the contract furnishes the measure of the attorney's recovery. The attorney may waive his lien and invoke such additional remedy against the adverse party. * * * By said sec-tion 4102, they could also pursue such ad-verse party, because a compromise had been made involving their lien, and without no-tice or opportunity to them to be present."

The actions of the landowners operated to defeat their rights to maintain their suit in the United States court and deprived these plaintiffs of their rights in that litigation. Is the oil company responsible for the ac-tions of the landowners? If the oil company was right in its contention that the former lease was yet in force and effect and that it had a right to drill to the deeper sand and produce therefrom, it could have pre-vailed in the litigation in the United States court, and there was no necessity for its ef-fecting a settlement with the landowners. On the other hand, if it was wrong in its contention, and it had gone ahead and de-veloped the property after its lease had ex-pired, it could not have prevailed in the litigation, and there was every reason for its wishing to effect a settlement with the land-owners. As we have heretofore pointed out, that settlement could have been effected by a specific agreement with the landowners, or it could have been effected by the oil com-pany inducing the landowners or agreeing with them to do something which would deprive the landowners of their rights to prevail in the litigation. The execution of a division order and the payment of a por-tion of the proceeds of the sale of the gas would accomplish that result. When the oil company, with the knowledge of the rights of these plaintiffs, took or procured from the landowners a new division order, there-by defeating the rights of the landowners to prevail in the suit in the United States court, it did so with knowledge that by so doing it was destroying the rights of these plain-tiffs in that litigation. When, with knowl-edge of the rights of these plaintiffs, the oil company paid to the landowners the portion of the proceeds of the gas taken from the premises, it must have known that by so doing it would defeat the rights of the landowners to prevail in their litigation, and defeat the rights of these plaintiffs

growing out of that litigation. The oil company, after having done those things, cannot now be heard to say that it did not make a settlement with the landowners. But it is said that the oil company was liable under the terms of the original lease to pay to the landowners the gas royalty and it did only what it was legally required to do. That is true, if the lease was still in force, but if the lease had expired by its terms, the landowners were entitled to all of the gas. That question was in litigation in the United States district court and undetermined. The oil company cannot be permitted to decide for itself the issue in that case and then rely upon its own decision to defeat the rights of the plaintiffs. If the oil company had given these plaintiffs notice that the landowners had requested the oil company to pay them for their portion of the gas sales, there would be a material difference, or, if the landowners had given such notice, there would have been a materially different question presented. Under the evidence in this case, however, the division order was executed and the payment of the gas proceeds was made to the landowners before any notice whatever was given to the plaintiffs.

There was considerable testimony that the oil company never did anything to procure a "settlement of the lawsuit," but as we have heretofore stated, the issue was not whether or not there had been a settlement of the lawsuit. The issue was whether or not there had been a settlement of the cause of action. No witness testified that this oil company did not procure a division order from the landowners and no one testified that it did not pay the landowners for the gas produced from the well both before and after the execution of the division order.

The relationship between the landowners and the plaintiffs is best evidenced by the letter to Mr. Helms just before the dismissal of the action in the United States court, as follows:

"Deer Creek, Oklahoma, April 13. Dear Mr. and Mrs. Helms—I wish to thank you for the flowers and to tell you how they were enjoyed and appreciated. I am sitting up most of the time now. Again thanking you for your kindness and thoughtfulness, I am, Yours sincerely, Mrs. Swaggert. With regards from Mr. S. and the boys."

With that letter in evidence to support the testimony of the plaintiffs there is ample reason for the jury having refused to follow the contention of Mr. Swaggert that they had been imposed on by the plaintiffs wrongfully inducing them to institute the suit against the oil company.

The landowners contend that they wanted to dismiss the suit and that plaintiffs would not consent to the dismissal. This record shows that they wanted to dismiss the suit only after the oil company had brought in a paying gas well and had paid the landowners a considerable sum of money from the sales of the gas. Up to that time the landowners expressed no desire to have the suit dismissed.

We hold that where there is any competent evidence of an arrangement between a client and his adversary by which the right of the client to prevail in his litigation against the adversary is defeated, the same constitutes prima facie evidence, and the court is warranted in submitting to the jury all of the facts and circumstances shown in evidence that the jury may determine from the evidence whether or not there was a settlement or compromise of the cause of action of the client.

We think this record shows that a settlement was entered into between the oil company and the landowners, without notice to plaintiffs, which was intended to, and did have the effect of destroying the cause of action of the landowners, thereby depriving plaintiffs of their rights.

At least there was competent evidence to sustain the verdict of the jury, and we find nothing in the record that would warrant this court in setting aside the judgment rendered thereon.

The third proposition presented is error in the rejection of the testimony of the witness Fletcher. The cost of the well was sought to be shown by this witness, the offer of the testimony being as follows:

"Q. How much did that well cost? Mr. Nowlin; Objected to as immaterial. The Court: What is the materiality of that? Mr. Ridings: To show how much they expended there in putting down this well. Mr. Nowlin: It has nothing to do with our cause of action. The Court: I don't see what difference that would make. Mr. Ridings: Exception. Q. Do you know, Mr. Fletcher, how much it cost to put this well down to this deep sand? Mr. Nowlin: Objected to as immaterial. The Court: Sustained. Mr. Ridings: The defendant, the Western States Oil & Land Company, now offers to prove by this witness that the reasonable and necessary expense of drilling this well to 4,-000 foot sand was approximately $130,000, which was expended and paid by the Western States Oil & Refining Company in drilling the same. Mr. Nowlin: The same ob-

jection, as immaterial. The Court: Sustained. Mr. Ridings: Exception."

The offer was in conformity with the opening statement in which it was said:

"The evidence will show further, gentlemen, when that well was completed and when they drilled into that gas sand down there and produced the well that is referred to here, that that lease had cost the Western States Oil & Land Company approximately $130,000."

A number of authorities are cited to support the contention that this evidence was competent. An examination thereof discloses that none of them support the contention. So far as this litigation is concerned, it is immaterial how much it cost to drill this well or how much the lessee owed the oil company. There is nothing in the lease that authorizes the extension of the term thereof by reason of the lessee having expended more money than it received therefrom. When the lease expired by its terms, the rights of the oil company ceased, whether its expenditures had been repaid or not, and the fact that the drilling of a well thereon resulted in a loss to the company is immaterial. In some cases the reasonable value or the reasonable cost of development is permitted to be charged, but there are many things that enter into the drilling of a well or the developing of a property that have a tendency to increase the cost thereof and which would not be a proper charge. In this case the oil company was from January 29, 1922, to the latter part of March, 1923, drilling this well from 2,947 feet to 4,010 feet. The delay was explained by the oil company by a statement that it had trouble with the casing. If the oil company was permitted to make any charge, it certainly could not charge expenses incurred by reason of defective material or the carelessness or negligence of its employees. However, we are not required to determine that question. The evidence offered was clearly incompetent, and there was no error in the rejection thereof. But if there was any error in rejecting this testimony, it was harmless error. The oil company in its brief states, "* * *all the evidence places the value at from $250,000 to $300,000." A special interrogatory was submitted to the jury which the jury answered fixing the value of the ⅞ working interest at $150,-000. Since the value fixed by the jury is approximately half the admitted value of the property and the difference is equal to the cost of drilling the well, we cannot say that the jury did not consider the cost of drilling the well in arriving at the value of the property, and we cannot see how there could be any prejudice to either the oil company or the landowners under this state of facts.

The fourth proposition presented is that the oil company was entitled to an instructed verdict. In support thereof it is contended that the plaintiffs wholly failed to show a settlement or compromise between the oil company and the landowners, and that the landowners could not have recovered in the original suit. We have discussed each of those contentions and determined them adversely. There was no error in denying the requests for a peremptory instruction.

The fifth proposition presented involves the instructions given by the court and the requested instructions refused by the court. It is claimed that the instructions given were contradictory, conflicting, and in conflict with the law as announced by this court in Orwig v. Emerick, supra.

The error in the instructions complained of, if any, was cured by the other instructions given. When the instructions are taken as a whole, we find no error therein; they are consistent and harmonious, and properly presented the issues to the jury.

It is contended that requested instructions Nos. 4, 5, 6, 7, and 8, which were refused, should have been given. Instruction No. 13 is substantially the same as requested instruction No. 4. Requested instruction No. 5 deals with the harsh and severe remedy of forfeiture. Since there was no question of forfeiture involved in the case, that requested instruction was erroneous. Requested instruction No. 6 is to the effect that a renewal of the relationship of lessor and lessee under the provisions of the prior lease would not be a settlement of a cause of action. It is apparent that that requested instruction was erroneous. Requested instruction No. 7 deals with the assertion that the oil company had the right and privilege to case off an oil sand and drill to a deeper depth. The instructions given covered the identical question. Requested instruction No. 8 deals with the question of failure to develop with due diligence, which was not in issue in the case.

The landowners requested an instruction which was given as instruction No. 15, as follows:

"15. The jury are instructed that before you can return a verdict for the plaintiffs in this case against the defendant, the Western States Oil & Land Company, it will be necessary for you to find that two separate and distinct propositions exist and it will

be necessary for you to find that each of same have been proven by preponderance of the evidence.

First: That the said defendant, the Western States Oil & Land Company, in conjunction with the said Swaggerts settled and compromised the cause of action which was pending in the United States District Court for the Western District of Oklahoma which is referred to herein.

"Second: That in said case referred to which was pending in the United States District Court for the Western District of Oklahoma, the said Swaggarts, as plaintiffs in said cause, had a good and meritorious cause of action and a right to recover in said cause."

Instruction No. 16 was requested by the landowners and was as follows:

"16. You are instructed that the fact that the defendants, Len S. Swaggart and Pauline Swaggart, entered into a contract with the plaintiffs in this action wherein and whereby they employed the plaintiffs as their attorneys, to prosecute an action for them against the Western States Oil & Land Company for the recovery of the interest held by said company under its oil and gas lease, did not deprive the defendants, Len S. Swaggart and Pauline Swaggart, plaintiffs in such action, of the right to withdraw and dismiss such action. You are instructed that under such contract of employment the plaintiffs in this action could not require the said Swaggarts to continue to prosecute such action, and the plaintiffs in this action, as attorneys for said Swaggarts, were only entitled to receive a fee in the event that said action was either prosecuted to a successful conclusion in favor of the plaintiffs therein, or a compromise or settlement of such action was effected, without their having been notified of such proposed compromise or settlement and being given the opportunity to protect their interests in such settlement. In this connection you are further instructed that if you find from the evidence in this case that the defendants, Len S. Swaggart and Pauline Swaggart, voluntarily dismissed the action brought by them against the Western States Oil & Land Company because they wanted to discontinue such litigation, and without any settlement of the cause of action having been theretofore made, then and in that event your verdict must be for the defendant, Len S. Swaggart and Pauline Swaggart."

Neither of these instructions was excepted to, and they are more favorable to the defendant than the law requires. We think that on the whole the instructions were favorable to the defendants, and find no error therein.

The question presented here is, Can a landowner employ an attorney, on a contingent basis, to procure a decree clearing his title of an oil lease that has expired by its terms, and, after notice to the oil company of the rights of the attorney, and the performance by the attorney of his duties under the contract up to that time, enter into an arrangement with the oil company, without the knowledge or consent of the attorney, whereby the expired lease is reinstated, without making the oil company and the landowner liable to the attorney for the agreed fee? Our answer is, No. This issue was submitted to a jury under proper instructions, and a verdict was returned by the jury fixing the amount of the plaintiffs' recovery at less than the amount warranted by the evidence. We find no error therein of which the oil company or the landowners can complain, and the judgment of the trial court is affirmed.

Request is made for a judgment on the supersedeas bond, and in conformity with the established practice it is hereby ordered, adjudged, and decreed that the plaintiffs, J. O. Helms and J. E. Falkenberg, have and recover of and from the National Surety Company of New York, the sum of $50,000, with interest thereon at the rate of six (6) per cent. per annum from the 6th day of March, 1926, together with the cost of this action, including the cost of this appeal.

MASON, C. J., LESTER, V. C. J., and HUNT, CLARK, RILEY, HEFNER, and SWINDALL, JJ., concur. CULLISON, J., absent.

Note.—See under (3) 2 R. C. L. p. 204; R. C. L. Perm. Supp. p. 377; (7) anno. 2 A. L. R. 337; 2 R. C. L. p. 1081; R. C. L. Perm. Supp. p. 613. See "Appeal and Error," 4 C. J. §2617, p. 706, n. 4; §2834, p. 854, n. 71. "Attorney and Client," 6 C. J. §416, p. 800, n. 67. "Juries," 35 C. J. §21, p. 153, n. 66. "Mines and Minerals," 40 C. J. §670, p. 1055, n. 42; §699, p. 1081, n. 31. "Venue,'" 40 Cyc. p. 104, n. 20.