**Amy HUTCHINSON et al., Appellants,**

v.

**William SCHNEEBERGER et al., Appellees.**

Court of Appeals of Kentucky.

Jan. 17, 1964.

H. Rupert Wilhoit, Wilhoit & Wilhoit, Grayson, for appellants.

William C. Kibbey, Grayson, Virgil H. Redwine, Sandy Hook, for appellees.

ELVIS J. STAHR, Special Commissioner.

This case is here on appeal by the lessors from a judgment awarding the lessee part of a tract of land leased to him for oil and gas development and denying them damages for alleged negligent drilling practices, and on cross-appeal by the lessee from the judgment allowing him only a part of the leased premises.

The lessee, J. B. Schneeberger, has died pending the appeal, and the appeal has been revived by an ancillary administrator.

The land involved here lies in Elliott County and is one of two tracts owned by R. F. Hutchinson at his death. It consists of 160 acres on Gilbert Fork of Middle Fork of Little Sandy River: Bounded on the north by land of Lish Branham; on the east by the land of Robert Oliver and John Hutchinson heirs; on the south by the land of Bascom and Rufus Hutchinson and by lands of C. R. Skaggs; on the west by the lands of C. R. Skaggs and James Fannin.

The other tract consists of 138 acres with a different location and in which the mineral rights were under different ownership.

At his death R. F. Hutchinson left surviving him his widow, Amy Hutchinson, and the following children: Clyde Hutchinson, who is married to Jewel Hutchinson; J. Harvey Hutchinson, who is married to Nancy Hutchinson; and Erie Kitchen, who is married to J. D. Kitchen.

On December 10, 1955, the widow, the heirs and their spouses executed a lease to J. B. Schneeberger and others (who subsequently assigned their interests to Schneeberger) for exploration and production of oil and gas on a 160-acre tract. The lease was for a fixed term of two years, expiring on December 9, 1957, unless oil or gas was then being produced, in which event the lease was automatically extended so long as gas or oil was being produced.

The lease contained an additional forfeiture clause which provided that if no well was commenced by June 10, 1956, the lease would terminate. However, this provision was tempered with a condition that by the payment to Amy Hutchinson of the sum of $10.00 the commencement could be deferred for three months for each such payment.

There was no activity under the lease until June 21, 1957, when an engineer made

a survey plat for filing with the Department of Mines and Minerals, and on July 2, 1957, a drilling permit was issued; and on September 21, 1957, a bulldozer was moved onto the land, a site was cleared and on September 26, 1957, drilling was begun.

Lessee had sent checks for payment of the "quarterly deferred commencement rental" for each three months through September 9, 1957. Each such payment of rent was several days tardy, but these checks were each received, endorsed and cashed by Amy Hutchinson as provided in the lease.

It further appears that Amy Hutchinson and her daughter, Erie Kitchen, and J. D. Kitchen lived on this farm and were present and knew of the operation as hereafter described.

In the drilling of the first well (there being a total of two) at the 150 foot level oil was found in "Maxam Sand," which made a good showing. Because, however, in this area the best production had been found to be deeper in "Weir Sand," lessee continued to drill and late in November, 1957, having reached "Weir Sand" and finding it dry and due to the severity of winter, he shut down.

In June 1958 lessee returned and pulled the pipe out from the Weir to Maxam level and in September 1958 began to pump oil from this well at the rate of three barrels a day.

In July 1958 lessee began to drill a second well after usual departmental notice to the owners-lessors and upon reaching "Maxam Sand" began to pump oil from this well at the rate of two barrels a day. Both wells were pumped into the same tank.

Under the provisions of the lease the lessors were permitted to take gas from the well to the residence and after the June 1958 resumption J. D. Kitchen for himself, his wife and Amy Hutchinson requested of lessee permission to connect to the well and to pipe the gas to their residence, which was granted and was done.

Some time in 1959 it appears that another of the lessors, J. Harvey Hutchinson, wrote a letter to lessee claiming a forfeiture of the lease because only two wells had been drilled.

The production of the two wells was bought by and delivery at the tank was accepted or made by Ashland Oil and Transportation Company and when, some time prior to July 9, 1959, the buyer requested a normal "Division Order" (authorization to divide the proceeds) the lessors refused to sign it. Thereupon the lessee filed this action which by subsequent amendment became an action for a mandatory injunction to require lessors to sign the "division order"; for reformation of the description of the property covered by the lease, as through mutual mistake or by error of the scrivener the boundaries of the 138-acre tract had been used to describe the 160-acre tract; for a judgment validating his lease and removing a cloud from his leasehold interest; and for a recovery of damages by reason of slander to his title by lessors.

Lessors by answer and counterclaim, also amended, denied lessee's right to re-enter the land; alleged termination by expiration of the term as well as forfeiture under the June 10, 1956 commencement provision; and demanded damages for trespass and negligence in the drilling and non-protection of the first well.

Oral proof was heard by the Chancellor and the evidence has been transcribed and filed as a part of the record.

Lessee testified that he expended $6430.16 in producing Well No. 1, $3688.60 in producing Well No. 2 and $675.80 pumping costs to the time evidence was heard on November 12, 1959. The record does not disclose pumping costs after that date nor has an accounting been made by Ashland Oil & Transportation Company, and it now holds all of the revenue from the wells without interpleader; nor has it been made a party to this action and subject to any orders or judgments herein.

The case was practiced and treated on appeal as if both sides recognized that there was a mistake in the description of the land covered by the lease, and that through an innocent error the two tracts were mixed. The chancellor treated this as a known fact; however, in his judgment he failed to remedy the error.

The learned chancellor in his findings of fact and ruling of law held that lessee failed to pay deferred commencement rental after September 9, 1956, that there was no production at the expiration of the two year term on December 9, 1957, and that the lease terminated but that lessee made the improvements on the land in good faith, believing that he had a right to do so. Lessee was awarded ⅞ths of the past and future production of the two wells, with 10 acre protected area for the two wells, and lessors were awarded ⅛ royalty and an injunction against lessee to prevent his development of any of the remaining acres. The judgment further ordered the buyer to make distribution of the proceeds accordingly.

It seems obvious that the payment of $10.00 a quarter for deferring commencement of a well was little more than a token of good faith, as it amounts to about 5¢ per month per acre.

Amy Hutchinson for herself and the other lessors and the lessors through Amy Hutchinson had, by acceptance of the tardy payment, condoned the practice and when lessee actually began operation they accepted this as fulfillment of good faith as it was for this that the lease was given.

■ Equity does not favor forfeitures and the intent must be clear and unequivocal as well as the conditions therefor.

■ The beginning of preparation for drilling on September 21 was apparently accepted by both parties in lieu of an additional $10.00 rental. We therefore hold that there was a substantial compliance with the terms of the lease and that there was timely commencement.

The next question to be resolved is whether there was production within the intent of the lease on December 9, 1957, the date on which the term expired unless there was production.

The obvious purpose of the contract between these parties was the development of oil or gas production on this land.

Lessee had discovered oil at a shallow level in what had theretofore been recognized as a level not providing the best production and, using what seems to have been good practice elected to drill deeper to "Weir Sand," the recognized best production sand. There is no showing that discontinuing operation for the winter was not also the accepted practice. So he discontinued operation until the next spring when he returned and prepared to and did pump oil at the first discovered level. The oil was there and all parties knew it. If lessee had not reasonably and seasonably returned to pump the discovered oil we might here reach a different conclusion; however, he did return seasonably and did pump the oil already discovered.

This situation with a lease of the same or similar terms has not heretofore been presented to this court. All of the cases cited by counsel in briefs can be distinguished from this case by the terms of the respective leases.

The reasoning and holding in the case of Western States Oil and Land Company v. J. C. Helms, 143 Okl. 206, 288 P. 964, 72 A.L.R. 357, seems to be a fair statement of what the law of this state ought to be:

"Under an oil and gas mining lease for a specific term 'and as long thereafter as oil or gas, or either of them, is produced from said land by the lessee,' the lessee after having discovered oil or gas during the initial term of the lease may continue to produce oil or gas therefrom until the exhaustion of the oil or gas discovered during the initial term, or the lessee may, after the expiration of the initial term, tempo-

rarily abandon the oil or gas discovered during the initial term for the purpose of further exploration at a greater depth and with the intent to return and produce the oil or gas discovered during the initial term if other oil or gas is not discovered at the greater depth. * * *

" 'Accordingly, it has been held that the discovery of oil or gas in an upper sand, during the term, although neither was actually produced, and operations were continued with the intent of returning and producing from such stratum in case no further production was discovered at a lower level, vested in the lessee the right to produce from the sand discovered after the expiration of the term.' "

This court said in Reynolds v. White Plain Oil & Gas Co., 199 Ky. 243, 250 S.W. 975, that as a matter of public policy which looks to the facilitation of development work in oil, gas, and other minerals, a lessee who in good faith is prosecuting work for development with reasonable diligence will be protected against cancellation of his lease. We therefore hold that there was production under the provisions of the lease and within the intention of the parties and the lessee in good faith was prosecuting work for development with reasonable diligence. Thus the lessee is entitled to continue his leasehold interest in the entire tract covered by the lease so long as there is production. It follows that lessee is entitled to ⅞ of the production and lessors are entitled to ⅛ royalty.

The Ashland Oil and Transportation Company is not a party to this action and there has been no interpleader. Hence no order or judgment can be entered directing it to make division; however, proper action is available to bring it within the jurisdiction of the court.

This cause is affirmed on the appeal, reversed on cross-appeal with directions that a judgment be entered in conformity with this opinion.

The opinion is approved by the court and the judgment affirmed on the appeal and reversed on the cross-appeal with directions that a judgment be entered consistent therewith.