## GOBLE v. BELL OIL & GAS CO.

No. 12664—Opinion Filed Jan. 22, 1924.

Rehearing Denied Feb. 26, 1924.

### 1. Contracts—Oral Stipulations Superseded by Writing.

The execution of a contract in writing, whether the law requires it to be written or not, supersedes all oral negotiations or stipulations concerning its matter which preceded or accompanied the execution of the instrument.

### 2. Same — Construction of Unambiguous Writing.

If the written contract by its terms is clear and unambiguous and appears to cover the entire subject-matter of the contract, the court will not import independent terms and provisions, disconnected and unnecessary to give effect to the expressed terms as shown by the written contract.

### 3. Same—Common Meaning of Language.

In construing a contract that does not deal with subject-matter of a technical nature, the court will give the words and phrases used that meaning which they carry in application to subject-matter of a non-technical nature. In other words, the language used should receive the same meaning as it carries in common usage unless the contract shows a clear intention to give the language used a different meaning.

### 4. Same—Enforcement of Harsh Provisions.

Even though the contract contains harsh and burdensome terms which the court does not in all respects approve, it is the province of the parties in relation to lawful subject-matter to fix their rights and obligations, and the court will give the contract effect according to its expressed provisions, unless it be shown by competent proof that the writ-

ten agreement as executed is the result of fraud, mistake, or accident.

**5. Oil and Gas—Departmental Lease— Assignment—Effect of Approval by Secretary of the Interior.**

A lessee of a restricted departmental oil and gas lease may contract for the sale and disposal of the same under such terms and conditions as he might contract in relation to a commercial lease. If the proposed assignment be approved by the Secretary of the Interior, the conditions and terms of the contract for the sale thereof will be given the same effect as if the assignment had passed the title to the assignee at the time of its execution and delivery.

**6. Same—Accounting for Production.**

The contract and record in this cause presents a case for accounting between the parties in accordance with the rule applied in the case of Woodworth v. Franklin, 85 Okla. 27, 204 Pac. 452.

**7. Reversal of Judgment.**

Record examined; held, to be insufficient to support judgment for the plaintiff.

(Syllabus by Stephenson, C.)

Commissioners' Opinion, Division No. 4.

Error from District Court, Tulsa County; A. C. Brewster, Judge.

Action by the Bell Oil & Gas Company against B. G. Goble for the recovery of the value of certain oil production. Judgment for plaintiff. Defendant brings error. Reversed and remanded, with directions.

Moss & Owen, for plaintiff in error.

H. B. Martin and R. A. Reynolds, for defendant in error.

Opinion by STEPHENSON, C. The defendant contracted to assign and sell certain oil and gas leases to the assignor of the plaintiff pursuant to the terms of a written contract entered into by and between the parties on the 8th day of February, 1918. The contract included both commercial and departmental leases. Oil was being produced from both the commercial and departmental leases at the time of the execution and delivery of the contract. Among the several provisions and conditions of the written contract, were the following:

(1) The defendant bound himself to sell and assign to the assignors of plaintiff the oil and gas leases described in schedule "A" and made a part of the written agreement.

Schedule "A" included both the commercial and departmental leases involved in the contract.

(2) The entire purchase price to be paid for the oil and gas leases described in schedule "A" was $490,000.

(3) It was agreed that assignments properly executed covering all the leases described in schedule "A" should be placed in a bank at Tulsa with the abstract of title.

(4) The purchaser should have ten days thereafter in which to examine the abstract, and if on or before the expiration of the ten days the title should be approved, the purchaser should pay to the seller the following sum of money:

(a) $250,000, which together with the $50,000 previously paid, making a total of $300,000, should be considered as payment for the commercial leases and equipment thereon.

(5) The purchasers should place the $190,000 in a bank at Tulsa to the credit of B. G. Goble, not to be subject to his check until the assignments of the departmental oil and gas leases were approved.

(6) It was further provided, unless the assignments were approved within 75 days from February 8, 1918, the seller might elect to rescind the sale of the departmental leases, and in which event the depository was directed to repay the said sum of money to the proposed purchasers.

After a recital of the foregoing provisions and agreements then appears the following paragraph;

"It is agreed, subject to the regulations of the Interior Department, that all pipe line runs from and after the execution of this agreement and the payment of the initial $50,000 shall be the property of the purchasers, and that the sellers will execute all proper sales and division orders, and that all oil runs and all gas produced and sold up to the execution of this agreement and the payment of said initial sum, shall still belong to the sellers."

It is clear that the contract by its terms and provisions is made divisible in its relation, both to the leases to be sold and assigned and the oil runs to be received by the purchasers from the two properties, in order to fix and settle the rights of the parties in the event the Secretary of the Interior should disapprove the assignment of the departmental leases. The intention of the parties in relation to the entire subject-matter as evidenced by the contract appears to be:

(1) That the purchasers should operate and receive the oil runs from the commercial leases from February 8, 1918.

(2) If the Secretary of the Interior should approve the assignment of the departmental leases, the purchasers should receive the oil runs from such leases dating from February 8, 1918.

(3) If the Secretary of the Interior declined to approve the assignment of the departmental oil and gas leases, the proposed sellers should retain the oil runs and cause to be returned to the purchasers the $190,000 deposited with the bank as the purchase price for the two leases.

The departmental leases were on restricted Indian lands and the Interior Department had made the sale and assignment of such leases subject to its approval; hence, the sale and assignment of said leases were subject to the regulations prescribed by the department.

The last paragraph of the contract quoted above relates to the oil runs from both the commercial and departmental leases. However, it is clear that the parties did not intend for the action of the Secretary of the Interior in relation to the departmental leases to affect the oil runs from the commercial leases, as the preceding provisions of the contract had made the subject-matter divisible. If it were the intention of the parties to permit the action of the Secretary of the Interior in relation to the departmental leases to affect the oil runs from the commercial leases, then the provisions of the contract inserted for the purpose of rendering the contract divisible would be both useless and meaningless. Therefore, while apparently making disposition of all the oil runs from the property subject to the regulations of the Interior Department, it was the intention and purpose of the parties to affect only the oil runs from the departmental leases. In making the disposal of the oil runs from the property subject to the requirements of the Interior Department, the parties had in mind only the action of the Secretary of the Interior in the approval or disapproval of the assignment of the departmental leases. It is apparent from the express provisions of the paragraph and of the entire contract that the sellers intended that the purchasers should receive the oil runs from the departmental leases if the assignments were approved by the Secretary of the Interior. The effect of the paragraph is to expressly provide that the purchasers should have the oil run from the departmental leases from the 8th day of February, 1918, in the event the department subsequently approved the assignment of the leases. Later, and within the time specified by the written agreement, the department approved the assignment of the leases, and the bank paid the assignors of the departmental leases the full purchase price of $190,000. The lessee thereafter refused to account to the assignors of this plaintiff for the oil run from the departmental leases from February 8, 1918, to the date of the approval of the assignments by the Secretary of the Interior; hence, this law suit. However, during the interim the lessee had paid to the plaintiff $3,000 to apply on the oil runs. It is admitted that the total value of the oil run between the dates is $11,091.50. The plaintiff then commenced its action against the defendant to recover the balance of the oil run in the sum of $8,091.50. In the trial of this cause judgment went for the plaintiff in the amount sued for. The defendant has appealed the cause to this court and among the several errors assigned for reversal, are the following:

(1) Error of the court in overruling defendant's demurrer to the evidence.

(2) Error of the court in overruling defendant's motion for directed verdict.

(3) Error in refusing to allow the defendant cost of production and interest on purchase price between date of approval of assignments, and payment by the purchaser to defendant.

The contract introduced in the trial of the cause and the evidence present only the foregoing questions in this appeal.

If a contract is clear, plain, and unambiguous, it is the duty of the court in considering the provisions of the instrument, to give the words and phrases employed therein, when not used in a technical sense, the meaning attributed to such language when used in relation to subject-matter of a nontechnical nature. In construing a contract covering subject-matter other than of a technical nature, the language used therein should be given the meaning ordinarily received in its application to matters of everyday affairs. Hanna v. Mosher et al., 22 Okla. 501, 98 Pac. 358; City of Tecumseh v. Burns, 30 Okla. 503, 120 Pac. 270; Wolf et al.v. Blackwell Oil & Gas Co., 77 Okla. 81, 186 Pac. 484; Strange v. Hicks, 78 Okla. 1, 188 Pac. 347; Prowant et al. v. Seely, 77 Okla. 244, 187 Pac. 235; Barnsdall Oiil Co. v. Leahy, 195 Fed. 731. The court will not give effect to implied provisions in a contract unless the same would ordinarily follow from the expressed provisions. In other words, implied provisions cannot be used to import independent and disconnected provisions into a contract.

As before stated, the subject-matter of this contract is divisible, and so made, evidently, to meet the situation in the event of the disapproval of the assignment of the departmental leases. If the department had refused the approval of the leases, under the provision of the contract, it would not have af-

fected the contract and provisions in relation to the commercial leases. If the assignment had been disapproved, the seller would not have been called upon to restore any portion of the purchase price in connection with the sale and conveyances of the commercial leases, and the defendant would have continued in the operation of the departmental leases in relation to past and future production as if no contract had been entered into between the parties. So, in the event of the approval of the assignments, it follows that there was no consideration on the part of the purchasers to receive the oil runs from the departmental leases, free from cost of production. In view of the expressed provisions of the contract and in order to give the same effect, in the event of the approval of the assignments, an implied obligation arose on the part of the purchasers to allow the lessee the cost of production, between the date of the execution of the contract and the date of the approval of the assignments. It appears that the seller insisted on being allowed the cost of production and for this reason the purchasers delayed the payment of the purchase price of $190,-000 for the departmental leases. For such delay in payment arising on this account, the plaintiff should allow the defendants interest on the $190,000 at the rate of six per cent per annum. The trial court should have allowed the interest in question and also the cost of production in favor of the defendants. The liability in this case is a matter for accounting between the parties in accordance with the rules applied in the cases of Barnes v. Winona Oil Co., 83 Okla. 253, 200 Pac. 985; Zelma Oil Co. v. Nemo Oil Co., 84 Okla. 217, 203 Pac. 203; Woodworth v. Franklin, 85 Okla. 27, 204 Pac. 452.

The property in the departmental oil and gas leases was that of the defendant, subject to the sale being approved by the Interior Department. The defendant might contract in connection with this property as freely as in relation to any other property, subject to the approval of the department. When the department removed its restriction or gave its approval, there was not anything in the way of the contract being enforced in accordance with its terms and provisions. It is true a different question would be presented, if the department had not approved the assignments.

Therefore, it follows that the purchasers are entitled to the oil runs in accordance with the provisions of the contract, subject, however, to a charge for the cost of production and the interest charge referred to herein.

Therefore it is recommended that this cause be reversed and remanded for an accounting between the parties in accordance with the views herein expressed.

By the Court: It is so ordered.