**MOON MOTOR CAR CO. v. STATE ex rel. SHULL, Bank Com'r, et al.**

No. 19876. Opinion Filed June 2, 1931.

Hall & Thompson and O. O. Jenkins, for plaintiff in error.

J. F. Murray, for defendants in error.

SWINDALL, J. It appears that certain automobiles were sold to David Allison, doing business as Oklahoma Moon Company, by the Moon Motor Car Company, under its finance plan No. 2, which was as follows:

"By this plan the dealer pays his banker in cash ten per cent. of the wholesale price, which includes war tax. The banker in turn remits to us the ten per cent. in cash, and the bank's three months' certificate of deposit for 90 per cent. of the invoice price.

"We agree to renew this certificate of deposit at the expiration of 90 days for an additional 60 days on such cars that have not been sold and remain new and unused on the dealer's floor.

"If for any reason these cars are not sold at the expiration of the second certificate of deposit, and you have not met your obligations at the bank, we further agree to take the certificate of deposit off the banker's hands, providing the cars covered by the certificate of deposit are turned over to us new and unused.

"On this particular plan, you are paying ten per cent. of the wholesale price of the cars, plus freight. The 90 per cent. which the banker is advancing you is being deposited by us in his bank. This should assist you greatly in carrying a complete line of cars on your floor, and we are greatly interested in having you deal with your local banker instead of going away from your city for financial assistance.

"We feel positive that if you will show this plan to your banker—and if this will not suffice as to our assurance to repurchase cars, our treasurer will gladly write him a letter of repurchase like specimen on next page."

"Specimen.

"Repurchase Agreement.

"In consideration of your assistance or financing a dealer of Moon or Diana cars under our finance plan No. 2, as detailed on previous page, we hereby agree and pledge ourselves to repurchase from you on the basis of 90 per cent. of the wholesale or invoice price of the cars—providing same are delivered to us f. o. b. your city, are new, unused, free from all liens and freight and warehouse charges—such cars as remain on hand new, unused, and unsold, 90 days from the purchase thereof from us.

"It is furthermore agreed on our part that if the certificate of deposit is renewed for another 60 days, as outlined in finance plan No. 2, on such cars as remain on hand unsold, that this repurchase agreement will cover this extra period of 60 days."

In each case, after shipment, the company wrote the bank a letter of instructions regarding collection of the draft for the purchase price, agreeing to acceptance of a certificate of deposit, to an extension, and to repurchase, one of which letters, being identical with the others except as to dates, amounts, and car descriptions, was as follows:

"March 25, 1927

"Deposit Guaranty State Bank,
  "Ponca City, Okla.

"Gentlemen:

"On December 3, 1926, we made shipment of one carload of automobiles to the Oklahoma Moon Company of Oklahoma City, Okla., in G. T. Car No. 33554, the shipment consisting of the following models:

"1 6/60 Cabriolet    Car No. 9222  $917.68
"1 Series 'A' Sedan    " No. 16527 1076.41
"1 Diana Del 4dr. Sedan  " No. 84808 1418.98

"On December 4, 1926, we made a sight draft on this firm for the sum of $3,476.07, which was originally sent to the First National Bank of Oklahoma City, but which was, on March 22, transferred from the latter bank to you, by instruction as received from the Liberty-Central Trust Company of our City.

"In compliance with your request of March 24, this shipment is to be financed on our finance plan No. 2. According to this plan, this firm pays you in cash the sum of $404.31, which is arrived at as follows:— 10 per cent. of the wholesale or invoice price of the cars amounts to $341.31, plus $63 for extras or accessories loaded in this car, which are net cash, making a total of $404.31; for the remainder of $3,071.76, which is 90 per cent. of the wholesale or invoice price of the cars, we agree to accept your 3 months' certificate of deposit, bearing your usual rate of interest; this makes a total of $3,476.07, the amount of our sight draft the value of the shipment.

"In consideration thereof, we hereby agree and pledge ourselves to renew this C/D at its maturity date for an additional 60 days on such cars as have not been sold and remain on hand, new and unused, on their sample floor. Furthermore, if, for any reason, any of these cars are not sold when the second C/D matures, and this firm has not met its obligations with you, we will surrender this C/D—provided the cars, as covered by the said C/D, are turned over to us, new and unused, free from all liens, and with all freight, warehouse and interest charges paid and f. o. b. Oklahoma City, Okla.

"This will be confirmed by a letter from the Liberty-Central Trust Company.

"Yours very truly,
        "Moon Motor Car Co.
    "H. W. Klemme,
        "Treasurer."

"MP"

In each case the bank, the Deposit Guaranty State Bank of Ponca City, Okla., took the note of J. H. McIntyre, an employee of David Allison, secured by a chattel mortgage on the automobiles in the shipment, for the 90 per cent. of the draft, for which it issued its certificate of deposit to the shipper. The principal amount of the note was not handed to Allison and then handed back to the bank on deposit, but it would seem that in all probability in each case Allison was credited with the amount of the note and issued his check against the credit in purchase of the certificate of deposit.

The bank was taken over July 18, 1927, as insolvent, and the Bank Commissioner, overlooking the fact that it had chattel mortgages on the cars, brought suit against Allison and McIntyre, and sued out a writ of attachment under which seven cars covered by the chattel mortgages were attached. The Moon Motor Company at that time held several certificates of deposit and intervened in the suit, claiming that all of the attached cars were those for which the certificates of deposit had been issued, and claiming the right to repossess itself of the cars for default in payment.

The intervener's brief urges as a first assignment of error that the trial court erred in not sustaining its motion for judgment on the pleadings and on the opening statement of the attorney for the Bank Commissioner, and in support of its contention it claims that the finance plan was a special arrangement, and then cites authorities to the effect that a bank deposit may be subject to any

agreement which the depositor and the bank may make so long as third persons are not injuriously affected, and that if a deposit of money is special to pay certain outstanding checks, a bank has no right to charge the deposit account with an overdraft and defeat the claim of the payee of the checks, and it then offers a citation to the effect that the question whether a deposit is general or special depends on the understanding of the parties at the time the deposit is made. The intervener also urges its fourth assignment of error, to the effect that the Bank Commissioner had no greater right than the bank itself if it had continued in operation, and that, as the bank was a party to a special written contract with the intervener under which automobiles were shipped to the distributor under the conditions appearing in the record, the Bank Commissioner, representing the bank, had no right to take the automobiles by attachment or otherwise in violation of the rights of the intervener. The right claimed was the right to repossess itself of the automobiles on default in payment of the certificates of deposit.

(1) The intervener's petition and brief blandly assumed that it had a reserved right to repossess itself of the automobiles on default of the bank in payment of the certificates of deposit. Undoubtedly, had the possibility of the bank becoming insolvent presented itself when the agreement was made, such a right would have been reserved, but it appears from the agreement that actually was made that to assume such a right to have been reserved is altogether too violent an assumption. The brief refers to some correspondence prior to the sale, but it did not go beyond an inquiry as to a method of extending credit, and the answers covered two plans, finance plan No. 1 and finance plan No. 2. While there were two plans that the seller used, and plan No. 2 was used in these sales, both plans were worked out by the seller and the offers contained in them · and all of the terms were offers and terms proposed by the seller itself. Therefore, the language, and a construction and interpretation of it, in case of doubt, would be against the seller. Choctaw, O. & G. R. Co. v. Bond. 160 Fed. 403; Sac City Canning Co. v. Griffin Grocery Co., 99 Okla. 99, 225 Pac. 702.

But we do not have to resolve any doubt against the seller, as there is no doubt, because the intention to create only an option to return under an obligation to repurchase, instead of an obligation to return with a right to repurchase, seems too clear for argument, and only requiring the attaching a plain meaning to the language used.

In the first place, the clause literally expresses an obligation to repurchase rather than a right to repurchase, and from a clear understanding that the seller would be willing to repurchase the cars on surrender of the certificates of deposit, if they should be delivered f. o. b. Oklahoma City, Okla., with freight and war tax paid, free from warehouse charges and from liens, it would not necessarily or by any means probably follow that either the buyer or the bank would be willing to obligate itself to make such a return. At the maturity of the certificates the dealer would naturally have considerable money expended in selling efforts, and naturally might have a number of prospects just about to ripen into sales, which would save him from the loss of freight, war tax, warehouse charges, and selling expenses, and would also show him an appreciable profit, which would not only directly benefit him, but would also be expected to indirectly benefit the bank by enabling the debtor more easily to meet his obligations to the bank, or practically require them to be met by taking care of the lien indebtedness due to the bank. So, a willingness to comply with an obligation to repurchase might not be met by a willingness to permit a repurchase. Further, the intention to express only an obligation binding the seller to repurchase and not to express a right to repossess itself of the cars seems to have been by design and to have fully expressed the full extent of the obligation, as it was expressed by the seller to have been agreed to for the purpose of relieving the bank by permitting it to make an alternative settlement instead of paying the certificates. Further, had it been intended to reserve a right to repossess itself of the cars, it would have been natural to have inserted a clause expressly reserving such a right rather than to have merely obligated itself to accept from one debtor property belonging to a former debtor, with no provision expressed for forcing such a return and no apparent concern as to the manner in which the bank might deal with the distributor in or subsequent to the collecting of the draft.

It is elementary and requires no citations to show it, that the conditions under which goods are shipped by one party to another for future sale may assume any of a variety of forms, intentions, and results. Goods may be shipped on consignment to an agent, with no intention that title shall ever pass to him; they may be shipped subject to a condition precedent, such as requiring payment, before title shall vest in him; they may be shipped subject to a condition subsequent, providing that on default in payment title shall revest

in the seller; and they may be shipped on what is known as a "sale or return," in which the title passes to the buyer with an option to later return them under certain specified conditions, in which case the title passes, subject to an obligation to rescind and return the purchase money absolutely or under conditions, by way of what is practically a repurchase, or under a literal agreement of repurchase as appears in the present case, at the option of the buyer. A note to the case of Ferry v. Hall, 188 Ala. 178, 66 So. 104, appearing also in L. R. A. (N. S.) 1917 B, 620, contains at pages 626-651 an exhaustive review of the different classes of cases that are often recurring, and shows the distinctions and differences in situations arising in connection with shipments or deliveries of goods.

The cardinal rule of construction is to give to language its normal meaning. Delk v. City Nat. Bank, 85 Okla. 238, 205 Pac. 753; Goble v. Bell Oil & Gas Co., 97 Okla. 261, 223 Pac. 371.

Giving it that meaning, we find only an obligation to repurchase on the seller's part, and no corresponding obligation on the part of the buyer or the bank to resell or redeliver.

(3) Again, in contending that the deposit was special, the intervener's attorneys so concluded with ruthless disregard of legal theory applicable to the facts shown in the record. It can readily be conceded, as concluded in the brief, that there can be an agreement with reference to a special deposit so long as it does not infringe on the rights of others, but assuming without argument or the production of authorities that this deposit was special is treating with disregard and contempt one of the two high points in the lawsuit. It is clear from the fact that the seller recognized that at the maturity of the certificates the buyer might be indebted to the bank, it contemplated, at least, that the bank might never have collected more than the ten per cent. of the draft in money. However, although the certificate of deposit would undoubtedly estop the bank, even if it did not estop the seller, from denying the deposit of the money, still it does not appear that the certificate was anything more than a mere acknowledgment of a deposit and a promise to repay it, with interest, at a time in the future. The ordinary form of a certificate of deposit would not indicate that any special fund had been set apart to meet the certificate, but, rather, that the bank would pay the sum out of its general assets. Since the certificate was delivered to the seller, it clearly was not the intention that it be held by the bank merely as security for the obligation to repurchase if it and the buyer should elect to enforce it, and since the certificates were not introduced in evidence, we cannot conclude that they contained more than the ordinary acknowledgment of a deposit with an agreement to repay it at a specified time, with interest. The only thing that can be clearly seen is that the certificate was taken to avoid the necessity of the bank paying out the money at the time of collection of the draft, and that it was taken to induce the bank to finance the purchase without immediate diminution in its liquid assets by the payment of money not represented in its statement of assets and liabilities otherwise than by a note and mortgage of the buyer. In other words, as between the seller and the bank, the bank agreed to pay and the seller agreed to wait, or, rather, in correct legal theory, the intervener loaned the money to the bank to be repaid with interest at a future time. There appears nothing more than the promissory notes of the bank, payable at a future date, and that is the legal effect of a certificate of deposit in general terms. Morse on Banks and Banking (5th Ed.) vol. 1, sec. 298; Miller v. Austin, 54 U. S. 218, 14 L. Ed. 119; Kilgore v. Bulkley, 14 Conn. 363. And they create no trust relationship, but merely that of debtor and creditor. Morse on Banks and Banking, sec. 298, supra. And where money is left with a bank for a fixed time at interest, it becomes to all intents and purposes a loan. City of Aberdeen v. National Surety Co., 151 Wash. 55, 275 Pac. 62, 65 A. L. R. 794; Re Law, 144 Pa. 499, 22 Atl. 831, 14 L. R. A. 103; State v. McFettridge, 84 Wis. 473, 54 N. W. 120, 20 L. R. A. 223; Pocatello v. Fargo, 41 Idaho, 432, 242 Pac. 297.

This conclusion is not modified at all by the fact that the money certified to have been deposited was the proceeds of the collection of a draft, for, while money collected under instructions to collect and remit has been held by this court to be a trust fund (First State Bank of Bristow v. O'Bannon, 130 Okla. 206, 266 Pac. 472), the same is not true of money to be collected and held on deposit, as the instructions or agreement for deposit, in the absence of other provisions rebutting it, constitute the relationship of debtor and creditor between the bank and the depositor. See distinctions drawn by Riley, J., in the opinion in First State Bank of Bristow et al. v. O'Bannon, supra. Further, we find no stipulation or provision of any kind that will prevent the application of the

general rule announced in Bank of Blackwell v. Dean, 9 Okla. 626, 60 Pac. 226, that "Unless there are stipulations to the contrary, deposits of money made in a bank become part of its general funds, and create the relation of debtor and creditor between the depositor and the bank."

(4) "A general depositor is merely a general creditor of the bank, and is not entitled to any priority of payment over other general creditors, in case of an assignment for the benefit of creditors, or of bankruptcy." Bank of Blackwell v. Dean, supra. And, "Before a claim can be allowed as a preferred claim against the State Bank Commissioner in charge of an insolvent bank, it is necessary to establish, first, that the claim in question is a trust fund; and, second, that the fund in some form was a part of the assets of the bank which passed into the hands of the Commissioner." Thomas v. Mothersead, 128 Okla. 157, 261 Pac. 363; Mothersead v. Harris, 148 Okla. 285, 298 Pac. 602.

It is clear from the above that since the deposit was a general deposit and not a trust fund, there could be no preference on a claim under the certificate.

(5) The intervener in its brief, as a further ground for claiming the automobiles, claims that the bank parted with nothing in return for the notes and chattel mortgages and merely took them to indemnify it against loss on the certificates of deposit. As above seen, no relief can be given on the ground that the money supposed to be represented by the deposit was a special deposit, and while the intervener would seem to be estopped to deny a deposit of money in the bank, it appears that in making this claim it is insisting that no money was ever deposited. Admitting that, we can conceive of no claim which could be urged under such circumstances except a claim for subrogation. That claim would seem to be sufficiently answered by authorities already referred to, because since, for lack of a trust fund, one having deposited money in a bank which upon the later insolvency of the bank might be still in the bank capable of identification would not be preferred, although it was so thoroughly ear-marked as to make identification complete, it would follow that one would not be more able to claim mere notes and mortgages owned by the bank because of the ability to identify them and show that they originated in the transaction giving rise to the issue of certificates of general deposit, constituting merely the same relationship, debtor and creditor.

Further, while the bank was solvent and a going concern, the intervener, as stated above, was a mere general depositor, and while the bank held the notes and chattel mortgages, it alone had the title, and the intervener had no legal interest in them, and if we should concede that had the bank continued in business and had later dishonored the certificates of deposit, the holder could enforce a subrogation right, it is a right that would not arise until the later dishonor, and it would seem to be prevented from arising from a supervening equity of equality requiring a proration between depositors. Since a surety, until payment of the debt, is not entitled to securities held by the creditor, we see no reason why a creditor seeking securities held by its debtor, taken from the debtor's debtor, who was formerly a debtor of the creditor, could insist upon such right prior to the dishonor of the debtor's obligation. The intervener required no security to be taken, and clearly, while the bank was a going concern it had the right to deal with the security as it pleased. As to the equity of subrogation against a bank which has become insolvent being asserted against the equity of equality possessed by other creditors, the South Carolina court said:

"But the issue here is not between the petitioners and the Bank of Commerce or the Columbian Bank as a solvent institution, able to pay all creditors; it is between the creditors of the Columbian Bank, an insolvent institution, and the petitioners, who are claiming a preference in the distribution of assets. No rule of equity appeals more to the judicial conscience than that which requires the assets of an insolvent corporation to be distributed ratably among creditors. Against this equity there is no principle of subrogation which can avail petitioners."

"The doctrine of subrogation is a pure, unmixed equity, having its foundation in the principles of natural justice. Gadsden v. Brown, supra. As has often been said, it does not flow from any fixed law, but from principles of justice, equity, and benevolence. Cheesebrough v. Millars, 1 Johns, ch. 109, 7 Am. Dec. 494. Obviously, therefore, subrogation will not defeat a legal right or overthrow an equal or superior right of another." Livingstain v. Columbian Banking & Trust Company, 77 S. C. 305, 57 S. E. 182, 22 L. R. A. (N. S.) 442.

This conclusion does not militate against the doctrine that the Bank Commissioner holds the property by the same right and title as the bank, subject to the liens, priorities, and equities existing at the time of the failure of the bank, because at that time the intervener held under general certificates

of deposit and had only the status of a general depositor.

If there was any equity then existing that would entitle the intervener to hold these cars directly or to obtain them indirectly through any equity entitling it to the notes and chattel mortgages, no definite legal theory was advanced to show it, and no authorities were cited to support any such claim.

In the brief the intervener also asserted that it was agreed that what was paid in on the notes was to be applied on the certificates of deposit. We find no such agreement, nor can we conjure up such a provision merely because of an intervening insolvency of the bank.

The judgment of the trial court is affirmed.

RILEY, HEFNER, CULLISON, ANDREWS, and KORNEGAY, JJ., concur. CLARK, V. C. J., dissents. LESTER, C. J., absent.