**STRYKER v. PALMER et al.**

No. 21477.   Opinion Filed June 6, 1933.
Rehearing Denied April 24, 1934.

Charles O'Connor, Edward P. Marshall, J. J. D. Cobb, and Bleakmore, Barry, Farmer & Lee, for plaintiff in error.

Moss & Young, for defendant in error Benjamin F. Palmer.

ANDREWS, J. This is an appeal from a judgment of the district court of Tulsa county in favor of the defendant in error, who was one of the plaintiffs in that court, against the plaintiff in error, who was one of the defendants in that court.

The action was in equity. Thereby the plaintiff sought a judgment decreeing him to be the owner of an undivided one-half interest in certain oil and gas royalties and leases which had been acquired by the defendant. The basis of the action was a contract that had been entered into between the parties, which was as follows:

"The Palmer Specialty Company
"Manufacturers of
'The Palmer Control Head
"Tulsa, Okla.

"I, B. F. Palmer, having designed a new Control Casing Head, and other appliances for oil and gas well equipment, each and all to be marketed by the Palmer Specialty Company or on a royalty basis by other manufacturers, do hereby assign and convey (½ interest in all articles or equipment mentioned or any new ideas that may prove of value) to Mr. F. S. Stryker for a consideration of value, consisting of ½ interest in any new oil or gas developments entered into by me, F. S. Stryker. We each agree that our signatures on this agreement is sufficient and binding on both parties.

"B. F. Palmer
"Signed
"F. S. Stryker
"May 8, 1926.          Signed."

In his petition the plaintiff alleged that thereby the defendant agreed to give, grant, convey, and assign to the plaintiff "an undivided one-half interest in any new oil and gas developments entered into or acquired" by the defendant. It will be noted that the words "or acquired," as used therein, do not appear in the contract. In his opening statement the plaintiff said, "* * * and Stryker, upon the other hand, to give to Palmer an undivided one-half interest in any oil and gas properties that he might acquire." Evidently that was an intention on

the part of the plaintiff to place his own construction on the terms of the written contract. It was in no wise a statement of what the contract recited. The trial court, among other things, found that the parties to the contract intended that the contract should cover and have application to oil and gas royalty and royalty interest and working interest and oil and gas leasehold interest.

There are many questions of fact and questions of law presented herein, most of which we deem it unnecessary to determine. There is very little of the record that pertains to the principal issue of fact in the case, which is, what was the intention of the parties at the time they entered into the written agreement in question?

The plaintiff contends that the provisions of the contract are ambiguous, and that the trial court was justified in finding from evidence aliunde what that intention was. Though that be so, an examination of the record discloses that the finding of the trial court hereinabove referred to is against the clear weight of the evidence. The evidence does not support a finding that the parties to the contract intended at the time of the execution thereof that the plaintiff was to have any interest in property which the defendant would thereafter acquire, except only that property described in the written agreement as new oil or gas developments entered into by the defendant.

A considerable portion of the briefs is devoted to a discussion of what was contemplated by the parties when they used the term "new oil or gas developments." We do not consider it necessary to determine that question, for whatever was meant by that term was limited by the other language "entered into by me." To hold that the parties intended that the language used, to wit, "any new oil or gas developments entered in to by me," was intended to mean oil royalties that would be purchased thereafter by the defendant, would be to hold something in conflict with the language of the agreement and something not supported by the evidence in the case.

There is no dispute between the parties as to the rule of law applicable to the construction of contracts. For that reason no reference is made herein to the statutory provisions or the decisions of this court with reference thereto.

The nature of an oil and gas royalty is such that it cannot be construed to be within the meaning of an oil and gas development entered into by the owner thereof, in the absence of proof that the owner thereof did anything towards the development of the property for oil or gas purposes. There is no such proof in this case. The record in this case shows that the defendant merely purchased those royalties for investment purposes, and they are no more included within the provisions of this contract, either as written or as shown by the record in the case, than real estate would be that had been purchased by the defendant for agricultural purposes. Even such real estate would have some value for oil and gas.

As to that portion of the finding of the trial court pertaining to the oil and gas leases, we hold that the judgment of the trial court was correct. They are within the meaning of the contract as shown by the evidence in the case.

The judgment of the trial court is reversed. The cause is remanded to that court, with directions to vacate its judgment and to render a judgment in conformity herewith.

RILEY, C. J., and SWINDALL, McNEILL, OSBORN, BAYLESS, BUSBY, and WELCH, JJ., concur. CULLISON, V. C. J., absent.

Supplemental Opinion on Rehearing.

ANDREWS, J. In the petition for rehearing it is contended that the judgment of the trial court was reversed upon the single ground that "there was no testimony reasonably tending to support the judgment and findings of the trial court that the parties by the language employed in the contract intended to cover oil and gas royalties." The judgment of the trial court was not reversed on such a ground. It was reversed on the ground that the judgment of the trial court was against the clear weight of the evidence, the applicable rule in such a case.

In the petition for rehearing complaint is made as to the brevity of the opinion and the failure of the court to discuss the evidence. For that reason we will review some of the evidence shown by the record in this case and upon which the judgment of this court was based.

In the petition for rehearing filed herein by the defendant in error, who hereinafter will be referred to as Mr. Palmer, it is said:

"As tried in the lower court and as presented originally in this court the case involved a number of questions and issues both of law and of fact. The action was

predicated and based upon the following contract:

" 'The Palmer Specialty Company, Manufacturers of the Palmer Control Head
Tulsa, Oklahoma.

"I, B. F. Palmer, having designed a new control casing head, and other appliances for oil and gas well equipment, each and all to be marketed by the Palmer Specialty Company or on a royalty basis by other manufacturers, do hereby assign and convey (1/2 interest in all articles or equipment mentioned or any new ideas that may prove of value) to Mr. F. S. Stryker for a consideration of value, consisting of 1/2 interest in any new oil or gas developments entered into by me, F. S. Stryker. We each agree that our signatures upon this agreement is sufficient and binding on both parties.

"B. F. Palmer, (Signed)
"F. S. Stryker, (Signed)
"May 8, 1926."

"This contract was drafted, as the evidence in the record discloses, by two untutored laymen. After the signing of the contract Palmer, the defendant in error, went forward with his invention, perfected the same and sold one-half interest in it to J. T. McInnes for $15,000. Stryker, the plaintiff in error, with the investment of only $5,000, acquired immense and valuable oil and gas royalty interests in the state of Texas, and refused to account to Palmer for Palmer's interest in same under said contract.

"Palmer brought his action in the district court of Tulsa county, Okla., seeking to recover his interests in said royalties under and by virtue of said contract. Stryker defended, first, upon the ground that there was a contemporaneous oral contract, containing a condition precedent to the written contract, and that Palmer failed to meet the condition precedent, and that the written contract was abandoned by both parties. Second, upon the ground that no consideration moved to him under the written contract. Third, upon the ground that the contract was unconscionable. Fourth, upon the ground that in so far as said contract related to rights in oil and gas mining developments, leases, royalties and property, that said contract was invalid under the statute of frauds.

"The amended separate answer of Stryker, the plaintiff in error, does not advert to, plead, nor mention the theory adopted by this honorable court in finally reversing the case. All of the issues and defenses raised by this plaintiff in error were met by the defendant in error in the trial court, and the trial court in its findings of fact and conclusions of law found in favor of the defendant in error upon each contested issue."

There are a number of statements therein which are not supported by the record in this case.

We do not know what the writer meant when he said that the contract was drafted "by two untutored laymen." With reference to the drafting thereof Mr. Palmer testified as follows:

"Q. Now, Mr. Palmer, you stated on your direct examination that you had had no experience in the oil business? A. Oil promotion business or promotion of oil and gas, as I understood that question. Q. You have had experience in the oil business? A. Yes, sir. Q. You are familiar with the means employed in the development of oil properties? A. Oil properties? Q. Yes— the drilling of oil wells, you know about that, don't you? A. Yes. Q. You know about that? A. Yes. Q. Now, you have had experience with that? A. Yes, sir. Q. Considerable experience? A. Yes, sir. Q. So much, that you have regarded yourself as an authority on mechanical devices relating to the drilling of oil wells and the production of oil from them? A. Well, I don't know that I am an authority on it, but I can say that I know about it as well as the average oil man. Q. Away back in 1908, you had conceived the idea of a control head to be used in connection with drilling wells? A. Yes, sir. Q. That conception proceeded from your actual understanding and knowledge of the oil business? A. Yes. Q. And operations in the oil fields? A. Yes. Q. You had been engaged in the employ of the Pure Oil Company in West Virginia? A. Yes. Q. In the production phase of the business? A. Yes. Q. That is, in the producing of oil? A. Yes. Q. You knew and now know that the drilling of oil wells involves an investment of money, don't you? A. Yes, sir. Q. And a considerable sum of money, too, don't you? A. Yes, sir. Q. And that it is an expensive business in which to operate? A. Yes, sir. Q. You know that? A. Yes, sir. Q. And you did know that all the time that we have been discussing here about your relations with Mr. Stryker? A. Yes."

In view of that testimony it cannot be said that Mr. Palmer was untutored in the oil business, although he was a layman. That testimony shows definitely and certainly that he was experienced in the oil production business.

Mr. Palmer wrote out the contract in long hand and after it was approved by Mr. Stryker, they had Mr. Donahoe type it. When Mr. Palmer, a man experienced in the oil production business, wrote that contract he must have known that the language "oil or gas developments entered into by me, F. S. Stryker" would not in-

clude oil or gas royalties thereafter purchased by Mr. Stryker. If it had been his intention that the contract should include oil or gas royalties thereafter purchased by Mr. Stryker, it would have been easy for him to have said so. The fact that he did not say so indicates that he did not intend so, and if there is any uncertainty in the contract, the language thereof should be interpreted most strongly against him, for he caused the uncertainty to exist. Sac City Canning Co. v. Griffin Grocery Co., 99 Okla. 99, 225 P. 702; Continental Oil Co. v. Fisher Oil Co., 55 Fed. (2d) 14; Moon Motor Car Co. v. State ex rel. Shull, Bank Com'r, et al., 149 Okla. 190, 1 P. (2d) 358; Cardwell-Lyman Sales Co. v. Liebman, 110 Okla. 21, 236 P. 16.

Another error in the statement quoted from the petition for rehearing is that it does not include a material defense which was pleaded by Mr. Stryker in his amended separate answer, that is, that the contract "is too indefinite, vague, and uncertain to be enforceable in equity." That such a defense was pleaded was admitted by Mr. Palmer when he alleged in his reply filed in the trial court that "Plaintiffs * * * further specifically deny that said contract is too indefinite and vague to be enforceable in equity." He did not deny that the contract was indefinite and vague. He used pages from 174 to 211, inclusive, of his brief in discussing the law applicable to indefinite and uncertain contracts.

The provision of the contract sought to be enforced in this action is: "1/2 interest in any new oil or gas developments entered into by me, F. S. Stryker." That the meaning of that term is indefinite, vague, and uncertain cannot be questioned by Mr. Palmer, for if it is not indefinite, vague, and uncertain, Mr. Palmer must lose. The language used does not include oil and gas royalties purchased by Mr. Stryker.

As stated in the opinion in this case, Mr. Palmer in his petition alleged that by the contract Mr. Stryker "agreed to give and grant and convey and assign to the said plaintiff, Benjamin F. Palmer, an undivided one-half interest in any new oil and gas developments entered into or acquired by said F. S. Stryker." The words "or acquired" are not in the contract and the language of the contract cannot be given such a meaning.

Since Mr. Palmer contended that, by the terms of the contract, he was to acquire an undivided one-half interest in all of the oil and gas royalties which Mr. Stryker thereafter purchased, the burden was upon him to support that contention. This he could do by showing that the terms of the contract, as prepared, granted him that right, or by showing that the contract was ambiguous, indefinite, and uncertain. He attempted to show that the contract was ambiguous, indefinite, and uncertain. In his brief he said:

"In support of our contention that this contract is sufficiently indefinite and uncertain as to the interest intended to be conveyed by Stryker to permit the court to consider the circumstances surrounding the parties at the time of the execution of the contract and the construction thereafter placed on it by the parties and that after considering same the court properly held the contract to cover the Pecos county royalties, we desire to call this honorable court's attention to the following authorities: * * *"

He followed that statement with a discussion of statutes and decisions. He contended that those statutes and decisions supported his contention that:

"The contract in question in the instant case is of such a degree of indefiniteness and uncertainty as to that which Stryker is agreeing to convey as to justify the court in considering both the circumstances and conditions surrounding the parties at the time of the execution of the contract and the construction placed on the contract by the parties after its execution, and taking these things into consideration in connection with the language of the contract, the court correctly held that said contract covered and applied to the Pecos county oil properties acquired after the execution of the contract by the defendant Stryker."

That statement shows that he is relying upon two rules for an interpretation of the contract as made: First, that it should be interpreted in the light of the circumstances and conditions surrounding the parties at the time of the execution of the contract; and second, that it should be interpreted in accordance with the construction placed on it by the parties after its execution. He fails to give consideration to the rule hereinbefore stated that in case of ambiguity in the terms of a contract, the interpretation should be against the party using the term. Moon Motor Co. v. State ex rel. Shull, supra.

In support of the first rule, he cites section 9460, O. S. 1931, which is as follows:

"A contract must be so interpreted as to give effect to the mutual intention of the parties, as it existed at the time of contracting, so far as the same is ascertainable and lawful."

Under that statute the intention of the parties must be ascertained "as it existed at the time of contracting," and not at some prior or subsequent time. The best evidence of the intention of Mr. Palmer, at the time of the contracting, is his testimony with reference thereto. That testimony shows that theretofore he had manufactured an oil well appliance in violation of the patent rights of another; that Mr. Stryker had been interested with him in the loss sustained by reason of the infringement on that patent; that they were desirous of abandoning the Palmer Specialty Company, under which they had theretofore operated, and that Mr. Palmer thought that he could perfect a new control head which would not infringe on any patent. With reference to the execution of the contract, we quote from the testimony of Mr. Palmer, on direct examination, as follows:

"Q. Now, then, after this lawsuit was decided against you here in the United States District Court on February 26, 1926, down to May 8, 1926, upon the subject of your designing and patenting a control head with such improvements as you would be permitted to manufacture and to sell and the profits arising therefrom, did you have any conversation with the defendant Stryker? A. Yes, sir. Q. How often in that period did you talk to him about that subject? A. Most every day. Q. Now, in the beginning, did Mr. Stryker seek to have you give him an interest in this control head which you intended and proposed to manufacture and to patent? A. Yes. Q. Well, without going into the details of those discussions, tell the court, in the beginning, what interest it was that Mr. Stryker wanted in the control head which you proposed to patent, which would be an improvement upon the other and what your final oral understanding was upon that subject? Mr. Marshall: Objected to as incompetent, irrelevant and immaterial. The Court: Overruled. Mr. Marshall: Exception. By Mr. Moss: Q. Go ahead. A. Mr. Stryker was anxious to join me, and, as he termed it go 50-50 in the new enterprise. Q. All right, sir—finally, on May 8th, you and Stryker entered into a written contract, didn't you? A. Yes."

We quote from his testimony on cross-examination, as follows:

"Q. Now, I understood you to say on direct examination that the contract, identified as exhibit No. 9, was written out in Stryker's apartment in the Cynthia Court Apartments here in the city of Tulsa on the 8th of May, 1926? A. Yes, sir. Q. And there was present at the time it was written, yourself, Mr. Stryker, and Leo Donahoe? A. Yes, sir. Q. There was no one else present? A. Mrs. Stryker. Q. Mrs. Stryker was? A. Yes, sir. Q. Then, after the contract had been prepared by Mr. Donahoe writing it and doing the manual work of writing it on the typewriter— A. He typed it. Q. It was signed? A. Yes, sir. Q. And no one else was present when it was signed, other than the parties who were there during the course of its preparation other than you have just named? A. Not to my knowledge. Q. Then, I believe you stated that one copy was delivered to Mrs. Stryker? A. That is my recollection. Q. You retained one copy and the third copy was retained by Mr. Stryker? A. Yes. Q. All copies had been signed at that time? A. Yes. Q. That occurred in the morning of May 8th? A. Yes."

With reference to the intention of Mr. Palmer, as it existed at the time of the contracting, we quote from his testimony on direct examination, as follows:

"Q. Now, then, Mr. Palmer, prior to May 8, 1926, had Mr. Stryker ever talked to you or any other persons in your presence, about the organization of a rather large oil company? A. Yes. Q. Where did these conversations take place, in the main, now, please, sir? A. In Mr. Donahoe's and Mr. Stryker's office in the New Daniels building. Q. Before you went to Bethlehem, was there any conversation between you and Mr. Stryker about Mr. Stryker attempting to raise any money in Bethlehem for that oil enterprise of his? A. Yes. Q. How many times have you talked about that? A. Oh, as many as six. Q. Finally, before you went to Bethlehem on the 10th of May, and before he went to Pecos county, Tex., on the 10th of May, did you have any understanding with Mr. Stryker about your attempting to assist him while you were in Bethlehem in raising any money for this prospective oil company which he and his associates contemplated or desired to organize? A. I had an understanding that I would see if he could raise any money. Q. Well, when did you have that understanding? A. About May 9, 1926. Q. Well, did you finally have any understanding other than you were simply to see if you could find out for him to see if he could raise any money there? A. Yes. Q. What else? A He agreed to pay my expenses there, if I would do that. Q. Did he do that? A. Yes."

We quote from his testimony on cross-examination, as follows:

"Q. Who was it, if any one in particular, who told Donahoe what to write up in this contract? A. No one told him. I wrote that in long hand myself and handed it to Mr. Stryker to see if that was what he wanted and he never changed it or erased anything and we had Leo type it and he stated, 'that is what we want.' Q. was that long hand draft prepared in Stryker's

apartment? A. Yes, sir, on his dining room table. Q. And after it had been prepared there, it was handed to Leo and he transcribed it or reduced it to typewriting? A. Yes. Q. And then, you signed it? A. Yes. Q. About how long was consumed—how long was consumed in that transaction? A. Why, it did not take more than an hour. Q. I understood you to say a moment ago, and I want to get this clear, Mr. Palmer, that your understanding was and the talks that you and Stryker had together were to the effect that an oil business was to be organized, and you suggested, or Stryker suggested to you that you ascertain whether or not that oil business could be financed back at Bethlehem, Pa.? A. A part of that oil business; not all of it. Q. And that is the same oil business, as you understand, that is referred to in this contract between you and Stryker? A. Yes, sir. Q. Was that venture or enterprise, according to your understanding of the discussion, to have to do with the drilling of wells for oil or gas? A. I don't know what his proposition was, whether it was dealing in royalties or production, drilling of wells or wildcatting— I don't know. He did not tell me—just an oil company with $250,000, which he wanted to put over. Q. And that proposition of what the details might develop into was never discussed at all? No. There could have been lots of things."

From that testimony it is apparent that, at the time of the execution of the contract, it was Mr. Palmer's understanding that Mr. Stryker was to cause to be organized "an oil company with $250,000, which he wanted to put over." That that was the thing that he had in mind is clearly shown by his further testimony on cross-examination, from which we quote as follows:

"Q. Was any thought given or attention paid as to the question of how this oil business was to be financed? A. No, not to me. It was not mentioned to me. Q. Nothing said about who should put up the money— A. No. Q. —which would be required to carry on such a business? A. No. Q. No discussion of any sort was had as to what probably would be the financial requirements in the direction of capitalization of such a venture? A. Of what venture? Q. The venture in the oil business? A. I never agreed to any venture in the oil business. Q. I understood you to say this morning that there was talk about carrying on, or Stryker's carrying on an oil business? A. That was Mr. Stryker's talk—not mine. Q. You had nothing to say upon that subject? A. Not a thing. I was not in that business and never had been. Q. In the course of Mr. Stryker's discussion on that subject, no mention was made of where the money was to come from that was to meet the necessities of such an enterprise and the expenses of it? A. Of his proposition? Q. Yes. A. Why, he expected to raise not $50,000 or $60,000. He talked to me about—he was organizing or intended to organize a $250,000 proposition. I never said it was a $50,000 or $60,-000 thing, but $250,000 was the minimum. Q. Were you or were you not to be interested in that proposition? A. Only through my agreement to this contract with him, that I would share in anything he might acquire in that. Q. Well, where was that money to be raised? A. I don't know; that was his—I don't know. Q. You did not give any attention to that? A. No. He did not ask me to, either. Q. Well, he did not mention it? A. No. Q. Was there anything said about where the money was to come from with which to finance the patent proposition? A. Yes. Q. What was said about that? A. He agreed to help. Q. I just asked you what was said—don't say what he agreed to, but just what he said? A. He said he would finance that. Q. He said he would finance the patent proposition—then, as I understand, Stryker was to finance the patent proposition and also the oil proposition? A. Not in its entirety, the patent proposition. Q. What part of the patent proposition was to be financed otherwise than by Stryker? A. A small part of the financing would be the pattern making; that would be a small part of it; that was what he talked about. After these drawings, the next step is patterns and that is not financing it. Q. Well, whenever the time arrived that the patent had been secured, if it ever was, or ever will be, where was the money to come from with which to cause the device to be made, manufactured, sold, and distributed? Was that talked about? A. That is what you have to do with every invention. Q. I know, but was that matter discussed? A. No. Q. It was not? A. No. Q. Well then, when you got back to Bethlehem, Pa., or before you left for Bethlehem, Pa., was there anything said as to what, if anything, you should be in the direction of undertaking to interest capital at Bethlehem in this proposition? A. Yes. Q. All right—what was said? A. Mr. Stryker asked me what I thought about the Bethlehem persons whom I might be able to approach—what I thought they would do about entering an oil proposition, if it looked good. Q. And what did you say? A. I said they are well able to enter into anything that looks good, as far as finances are concerned; if he had anything that could interest them, that it might be worth while. Q. Well, did that talk have reference to the capitalization of this $200,000 oil company, or whatever it was, that you and he previously had discussed? A. I presume that is what he meant, is some company. Q. Well, did you understand that to be what he meant? A. Yes. Q. Well, did you say anything to him as to whether or

not you would try, when you got back to Bethlehem, to investigate and see whether or not, among your acquaintances or contacts back there, this proposition could be financed? A. I said that I would tell them—talk to them about his proposition, as near as he could tell it to me, and advise him what they thought of it. Q. Well, when you went back there, did you talk to any of your friends there? A. Yes. Q. On that subject? A. Yes. Q. You talked to Mr. Lowe about it, didn't you? A. Yes. Q. What resulted from your inquiry and investigation back there? A. Mr. Lowe told me to have Mr. Stryker come to Bethlehem. Q. You then wrote to Mr. Stryker and asked him to come to Bethlehem, did you not? A. I either wrote or wired. Q. At any rate, you suggested to him to come? A. Yes. Q. And pursuant to that suggestion, he did come? A. Yes. Q. And arrived at Bethlehem about the 16th of June, 1926? A. Yes. Q. And then, he remained there for three days? A. Yes. Q. And then you and he left simultaneously? A. Yes. Q. And during that three days' time, both you and he ascertained that no money could be raised at Bethlehem to finance this oil proposition? A. I did not have anything to do with it, after he came. That was left entirely up to him. I introduced him. Q. Did you have any talk at all upon that subject and with Mr. Lowe, after Mr. Stryker had gotten back there? A. Yes, Mr. Stryker had a talk with him the second evening he was there, and after he had been in consultation with Mr. Lowe, and I don't know who else, because I was not with them, but Mr. Stryker informed me in the evening that he was going to take $60,000 back with him to Tulsa. Q. So, he was going to take it or undertake to take it? A. Going to take it. Q. Well, did he take it? A. I guess not. Q. Well, you know, don't you? A. Yes—he didn't. Q. He did not? A. He did not. Q. And the money was not raised at Bethlehem? A. No. Q. Now, prior to the time that you had asked Mr. Stryker to come back to Bethlehem, either by telegram or by wire, and about two weeks after your arrival there and about two weeks before he came there, you had discussed the matter of financing this oil proposition with your friend, Mr. Lowe, had you not? A. I don't remember. Q. You don't? A. No, sir; I don't. Q. Do you remember whether or not prior to the time you had spoken to Mr. Lowe about Mr. Stryker coming back there, you had discussed with Lowe the proposition as to whether or not the oil venture might be financed there? A. I had talked to Mr. Lowe, but what date, I don't remember, but it was before Mr. Stryker came back. Q. Was that also before the time you had wired or written to Mr. Stryker, as the case may have been, to come on back there? A. I don't know that. I just don't remember."

From that testimony it is apparent that, at the time of the contracting, Mr. Palmer intended that Mr. Stryker, with the aid of Mr. Palmer, was to raise a minimum of $250,000, in such manner as Mr. Stryker thought proper, for use by a company to be organized by Mr. Stryker for the production of oil and gas. That testimony is entirely consistent with the language used in the contract. There is nothing in it inconsistent with the language used in the contract or that indicates any intention on the part of Mr. Palmer that Mr. Stryker was to give to Mr. Palmer a one-half interest in oil or gas royalties which Mr. Stryker should thereafter purchase. In view of that testimony the provision of section 9471, O. S. 1931, is not applicable and the provision of section 9472, O. S. 1931, is applicable. It is as follows:

"However broad may be the terms of a contract, it extends only to those things concerning which it appears that the parties intended to contract."

From Mr. Palmer's testimony it appears that the parties did not intend to contract with reference to oil or gas royalties to be purchased by Mr. Stryker with his own funds for his own benefit.

The controlling statute is section 9473, O. S. 1931, as follows:

"If the terms of a promise are in any respect ambiguous or uncertain, it must be interpreted in the sense in which the promisor believed, at the time of making it, that the promisee understood it."

The testimony of Mr. Palmer shows that, at the time of the making of the contract, Mr. Stryker, the promisor, believed that Mr. Palmer, the promisee, understood that Mr. Stryker was agreeing to convey to Mr. Palmer a one-half interest in any new oil and gas developments thereafter entered into by Mr. Stryker, that is, through the operation of an oil and gas company which was to be organized and financed for the purpose of developing oil and gas properties.

The property involved in this action, with the exception of one oil and gas mining lease, consists of oil and gas royalties which Mr. Stryker purchased with his own money. In view of the positive testimony of Mr. Palmer, this court must hold that the judgment of the trial court, that the parties to this agreement intended, at the time it was executed, that oil and gas royalties thereafter purchased by Mr. Stryker were to be purchased for the benefit of

Mr. Stryker and Mr. Palmer jointly, is against the clear weight of the evidence.

The second rule of construction submitted by Mr. Palmer is not a correct one. The construction to be placed upon an ambiguous contract is not the construction placed thereon by the parties "after its execution," as stated by Mr. Palmer, but the "contemporary construction placed thereon by the parties, that is, the construction "during the period while harmonious and practical construction reflects that intention." Strange v. Hicks, 78 Okla. 1, 188 P. 347. That construction is shown by the evidence of Mr. Palmer that he knew that the Douglas Oil Company held the title to the oil and gas royalties for the use and benefit of Mr. Stryker and that Mr. Donahoe also had an interest in the property. We quote from the testimony of Mr. Palmer as follows:

"Q. Prior to the time you brought this suit, did you ever tell any officer of the Douglas Oil Company that you claimed or contended that you had an interest in this royalty proposition which stood in their name? A. No, sir. Q. Did you make any demand upon them of any kind or character at any time to give you any information or data in reference to that proposition, before you brought this suit? A. No, sir. Q. Had you, prior to the time you brought this suit, made any trip or visit to Pecos county, Tex., or that vicinity for yourself discovering and finding out what the situation was? A. No, sir. Q. Prior to the time you brought this suit, did you ever make any statement to Mr. Donahoe to the effect that you had or contended you had an interest or claim of interest in this Pecos county royalty? A. No, sir. Q. Did you, at any time, after September, 1928, on the occasion of Mr. Stryker's last visit with you at your home at Lanagan, Mo., ever make any statement or a demand upon him that you wanted a conveyance or other evidence of your interests in the Pecos county property? A. No, sir."

When that testimony is examined in connection with his testimony that he knew all about the drilling of the wells on the property in which Mr. Stryker owned an interest in the royalty, as early as January, 1928, and that he repeatedly visited with Mr. Stryker at his own home, at the home of Mr. Stryker, and at a hotel in Tulsa, we wonder why he did not assert a claim of ownership therein. This record shows that the first claim of ownership of interest in this property that was made by Mr. Palmer was a claim of ownership after Mr. Palmer had been advised by attorneys to file a petition in bankruptcy in order to avoid the payment of debts, and after Mr.

Moss, the attorney for Mr. Palmer in this case, advised him not to do so "because of the existence of this identical contract which is involved in this lawsuit." With reference to bankruptcy he testified:

"Q. Did you mention to Mr. Stryker or any one else a purpose, which you then entertained, to take the benefit and advantage of the bankruptcy act? A. Yes. That was suggested to me by all the attorneys in the Heggem suit. Q. Your counsel? A. Yes. Q. What was the object and purpose of that suggestion, Mr. Palmer? A. I suppose to clear my slate, so I could start over new again. Q. Well, you were under a liability on account of that judgment which had been rendered against you in that case? A. I am now. Q. You were then, I say? A. Yes, and I am still under it. Q. At that time, did your assets equal your liabilities? A. No. Q. The judgment against you was for something in the neighborhood of $11,000? A. $11,590. Q. And your assets were substantially less than that? A. Yes. Q. What assets did you have at that time, Mr. Palmer? A. Income from Arbon and Company at that special time. Q. That was all? A. That was all. Q. Except your homestead and place where you lived, I assume? A. Yes. Q. Your property up there in Missouri, where you lived? A. Yes. Q. You were engaged, during that time, in no work that was producing a current revenue? A. No, sir. Q. And the results of the Arbon contract were used by you as a means to provide for yourself and family? A. Yes, sir."

That testimony is inconsistent with the present claim of ownership. The contemporary construction placed upon the contract by the parties was that Mr. Palmer did not have any interest in the royalties. Mr. Palmer so construed it or he would not have attempted to file a petition in bankruptcy when his indebtedness was less than $12,000, and when he had knowledge of ownership of a one-half interest in the royalties in question which was worth considerably more than the amount of his indebtedness. The construction which Mr. Palmer placed upon the contract, after Mr. Moss, his attorney, had advised him not to file a petition in bankruptcy because of the existence of the contract in question, was not a contemporary construction and is not within the rule stated. It was a construction which, as stated in Strange et al. v. Hicks et al., supra, was "at variance with the practical construction" that he had theretofore placed upon it. In the language of this court in that decision:

"It is to be assumed that parties to a contract know best what was meant by its terms, and are the least liable to be mistaken as to its intention, that each party is alert to protect his own interests and to in-

sist on his rights, and that whatever is done by the parties during the period of the performance of the contract is done under its terms as they understood and intended it should be."

The record shows that Mr. Stryker purchased these royalties without any aid or assistance from Mr. Palmer; that he sold an interest therein on two occasions; that he never at any time accounted to Mr. Palmer for any portion thereof, and that Mr. Palmer never at any time asked him either for a conveyance or an accounting until Mr. Palmer instituted this suit.

While there is some testimony in the record supporting the judgment of the trial court, and there must have been some such testimony or the trial court would not have rendered the judgment which it rendered, this court is of the opinion that Mr. Palmer, the plaintiff in this case, has failed to show by a preponderance of the evidence that the contemporary construction of the contract by the acts of the parties gave it a construction which entitles Mr. Palmer to recover in the case.

We can come to no other conclusion after a review of the positive evidence hereinbefore set forth. There is much other evidence in the record to the same effect. We do not think it necessary to set out herein any more of it. This record clearly shows that Mr. Palmer sought to convey to Mr. Stryker an undivided interest in a desire to patent some device which would not infringe upon some patented device and which would be of some commercial value, in exchange for an undivided interest in Mr. Stryker's "illimitable vista of hope" to be able to promote a corporation with a capital of not less than $250,000 for oil or gas developments.

It is apparent from the record that the judgment of the trial court is against the clear weight of the evidence, and for that reason the petition for rehearing is denied.

RILEY, C. J., CULLISON, V. C. J., and SWINDALL, BAYLESS, and WELCH, JJ., concur. McNEILL, OSBORN, and BUSBY, JJ., dissent.

On Rehearing.

McNEILL, J. (dissenting). I am unable to concur in the majority opinion. This is an equitable action, and it is one of those cases which calls for the proper rule to apply to a judgment of the trial court presented to this court on review.

This court rendered an opinion on April 12, 1932, sustaining the judgment of the trial court. Thereafter a rehearing was granted and this court rendered another opinion on June 6, 1933, whereby the judgment of the trial court was vacated and set aside. At the time of the rendition of the latter opinion the personnel of the court had changed, there being four new members who had not participated in the opinion of April 12, 1932. After the matters in controversy had been discussed in conference, I concurred in both of these opinions. Since the oral arguments presented to the court on the petition for rehearing on the last opinion, I have personally read the entire record and the exhaustive briefs. As the result of a close study of the questions presented herein, it appears to me that this case presents a record upon which the trial court would have been justified in finding either for the plaintiff or for the defendant. The dividing line is slender. It is inescapable that a study of this record presents facts which could not leave the trial court altogether free from some doubt, at least, as to which side should prevail in an action based upon facts and circumstances as shown in the instant case.

It is to be remembered that this is not an action de novo, but we are considering an appeal from the judgment of the trial court in an equitable action. This court is not sitting as a trial court, and is not in a position to adjudge the credibility of the witnesses. It is not a question of this court taking a different view from that which was taken by the trial court, and pronouncing a judgment herein from the record which has been submitted to it on review as if this were an original proposition. It is sufficient to say in this case that the evidence detailed by this record is extremely conflicting. It was apparent that it would be so after the opening statements of counsel were made as recorded in the record.

Counsel for defendant, at the threshold of his opening statement, stated to the court as follows:

"If the court please, it is readily evident from the statement of counsel, that there will be some very sharply drawn conflicts in the evidence."

The trial court heard these witnesses. It has a peculiar advantage over the reviewing court in determining the weight and credibility of the witnesses. It observes their action, their demeanor on the stand, their interest, if any, in the case.

It is apparent to me that the trial court could have rendered a judgment for the plaintiff or for the defendant, and that there is substantial evidence to support a judgment for either. It is not the province of this court in an equitable action to set aside the judgment of a trial court unless it is clearly wrong. Heckman v. McQueen, 57 Okla. 303, 157 P. 139. It is not sufficient that this court might reach a contrary conclusion.

Before a judgment of the trial court in an equitable action should be set aside, it should appear that such judgment is clearly and manifestly wrong and against the clear weight of the evidence. As I review this entire record, I am unable to conclude that the evidence submitted to the trial court was of such clear and convincing character that this court ought to set aside the findings and judgment of the chancellor who heard and saw the witnesses who testified.

In my opinion a rehearing should be granted and an opinion should be delivered sustaining the judgment of the trial court.

For these reasons, I dissent.

BUSBY, J. (dissenting). After re-examining and reviewing the briefs in this case and after hearing oral argument on the petition for rehearing on the last opinion filed, I concur in the dissent of Mr. Justice McNeill. I believe this case has been settled by numerous opinions, wherein we have laid down the universal and unbroken rule of law that we will not reverse the judgment of the trial court on a disputed question of fact, unless the same is clearly against the weight of the evidence.

It is my opinion that the weight of the evidence as reflected by the record is on the side of the trial court's judgment and fully warrants an affirmation of the trial court.